UNITED STATES of America, Appellee,

v.

Roy William HARRIS, also known as "Will Harris," Defendant–Appellant.

No. 117, Docket 94–1707.

United States Court of Appeals, Second Circuit.

Argued Sept. 18, 1995.

Decided Feb. 28, 1996.

---

David L. Lewis, New York City (Allison Miller, Lewis & Fiore, New York City, of counsel), for Defendant–Appellant.

Howard M. Shapiro, Special Assistant United States Attorney, New York City, (Mary Jo White, United States Attorney for the Southern District of New York, Eleni P. Kalisch, Special Assistant United States Attorney, Reid M. Figel, Nancy J. Northup, Assistant United States Attorneys, of counsel), for Appellee.

Before: MINER, MAHONEY and CABRANES, Circuit Judges.

MINER, Circuit Judge:

On September 9, 1992, a 24-count superseding indictment was filed charging defendant-appellant Roy William Harris with conspiracy to commit wire and bank fraud in violation of 18 U.S.C. § 371, wire fraud in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, money laundering in violation of 18 U.S.C. § 1956(a)(2), conducting a continuing financial crimes enterprise ("CFCE") in violation of 18 U.S.C. § 225, and making a false statement on a loan application in violation of 18 U.S.C. § 1014. The government also sought the forfeiture of Harris' assets pursuant to 18 U.S.C. § 982. Prior to trial, Harris moved to dismiss certain counts of the indictment and to sever Count 23, which charged him with making a false statement on a loan application. The district court granted Harris' motion to sever Count 23, but denied his motion to dismiss those counts charging him with

wire fraud, bank fraud, and engaging in a continuing financial crimes enterprise. *United States v. Harris,* 805 F.Supp. 166 (S.D.N.Y.1992). On December 14, 1992, a jury found Harris guilty on all counts tried. On the same day, Harris and the government entered into a stipulation settling the forfeiture count.

On March 26, 1993, Harris filed motions for a judgment of acquittal, pursuant to Fed. R.Crim.P. 29, and for a new trial, pursuant to Fed.R.Crim.P. 33, raising many of the same claims he now raises on appeal. On July 30, 1993, the district court denied Harris' motions in their entirety. *United States v. Harris,* No. S1 92 Cr. 455 (CSH), 1993 WL 300052 (S.D.N.Y. July 30, 1993). On December 22, 1994, the district court sentenced Harris to a 188–month term of imprisonment, a five-year term of supervised release, and a special assessment of $1100. The district court also ordered Harris to pay $200 million in restitution.

On this appeal, Harris contends that the district court erred in: (1) failing to instruct the jury, in relation to the CFCE violation, that it must find that his conduct occurred after the CFCE statute was enacted; (2) rejecting his claim that he was wrongly convicted for money laundering under 18 U.S.C. § 1956(a)(2); (3) rejecting his contention that his bank fraud convictions were multiplicitous and thus violated the Fifth Amendment; (4) imposing a $200 million restitution order in favor of the lending banks; (5) rejecting his argument that he was wrongly convicted for a CFCE violation because the statute was not meant to apply to his conduct; (6) denying his motion for a new trial because new evidence was discovered that would have led to his acquittal; and (7) declining to depart downward from the United States Sentencing Guidelines on the basis that he had a gambling disorder. For the following reasons, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

Harris was the president, chief executive officer, and majority shareholder of Arochem

Corporation ("Arochem") and Arochem International, Inc. ("International") (together, the "Arochem Companies" or "Companies"). International operated a petroleum and petrochemical refinery complex in Puerto Rico, while Arochem, which maintained its principal offices in Connecticut, traded in petroleum and petroleum products and provided management services to International. These management services included supervising the inventory and trading activities of International and marketing petrochemicals and petroleum products.

Vincent J. Dispenza was the Arochem Companies' chief financial officer. Dean Seniff, the Companies' comptroller, and Greg Holtzhauer, the Companies' accounting manager, also were involved in financial matters. Other Arochem Companies officers included Gene Sebastian, the Companies' executive vice president, and Joe Sheperd, the Companies' vice president of operations.

In January of 1990, a consortium of banks led by Chase Manhattan Bank, N.A. (the "banks") entered into a revolving credit agreement (the "agreement") with the Arochem Companies. The agreement expired in January of 1991, and was extended on six separate occasions through November 30, 1991. Under the terms of the agreement, the Companies were permitted to borrow up to $245 million as needed for their business operations. The loans covered by the agreement were to be secured by the Companies' inventory of petroleum and petroleum products and by the Companies' receivables and cash. The agreement included financial covenants that required the Companies to maintain minimum levels of working capital, net worth, and debt ratios, and precluded them from holding a net unhedged position of more than one million barrels of oil. If the Companies violated any of these covenants, the banks could either charge a "penalty" for the violation or demand immediate repayment of the loans. Finally, the agreement required the Arochem Companies to provide the banks with periodic reports known as "borrowing base reports," which listed all of the Companies' assets and trading positions.

## A. The Companies' Fraudulent Practices

In the fall of 1989, the Arochem Companies began to suffer financial difficulties that continued through the beginning of 1990. At a meeting of the Companies' officers in March or April of 1990, Seniff informed Harris, Dispenza, Sebastian, and Sheperd that the Arochem Companies had a year-to-date deficit of approximately $60 to $65 million. In addition, Seniff and Dispenza informed the other officers that they would be falsifying the Companies' financial statements by overvaluing the Companies' crude oil inventory.

Also discussed at this meeting was the upcoming Ernst & Young year-end audit of the Companies' books. It was understood by the Companies' officers that unless the Companies earned "$40 or so million dollars" by the end of the fiscal year, May 31, 1990, the Companies would not pass the audit. Dispenza claims that Harris then directed Sheperd and him to become more "creative" in assisting in the preparation of the financial statements.

In late April or early May of 1990, Harris, Dispenza, and Seniff devised a strategy for the approaching audit. It was determined that, in order to conceal the Companies' $60 to $65 million loss, Dispenza would falsify and exaggerate the value of the Companies' assets. As part of the scheme to disguise the Companies' losses, according to Dispenza, Harris provided Dispenza with an inventory contract for the purchase of two cargoes of crude oil from a company called Trieast Marketing ("Trieast"). Dispenza claims that Harris informed him that International would not take possession of the oil, but that the contract should be used for the year-end audit. Accordingly, Seniff and Dispenza created false documents, such as false warehouse receipts and warranty titles, in an effort to make it appear that the Trieast contract had been performed. This allowed the Companies to use the Trieast contract to exaggerate the value of their inventory and profits.

Even after this "creative" accounting, Seniff informed Dispenza and Harris that the Companies still showed a $25 million loss and that the only way to conceal the loss was

through "outright fraud." Not to be deterred, Seniff, with Dispenza and Harris' knowledge, removed from the Companies' accounts payable register several pages that revealed that the Companies owed $25 million in payables. During the course of its audit, Ernst & Young sought evidence of payment for oil inventory valued at $25 million, and Dispenza asked Harris what should be done. According to Dispenza, Harris replied, "[D]o whatever you can." Dispenza and Seniff responded by altering documents to indicate that the $25 million in oil purchases had been paid before the end of the prior fiscal year. As a result, the Companies' year-end income was increased by $25 million.

In its 1990 year-end financials, the Arochem Companies showed retained earnings of $13 million and a profit of $3.3 million. These numbers overrepresented the Companies' financial health by approximately $60 million. In September of 1990, Ernst & Young concluded its audit and provided the Arochem Companies with an unqualified opinion of financial condition based on the incorrect information supplied by the Companies. The audit then was provided by the Companies to the banks.

From September of 1990 through November of 1990, the Companies' financial troubles continued. The Companies' officers continued to misrepresent the Arochem Companies' financial health to the banks by altering their borrowing base reports and financial statements. In November of 1990, Seniff informed the Companies' officers that the Arochem Companies had sustained losses of over $103 million during the June 1990 to November 1990 period. As a result, the altered financial statements overstated the Companies' earnings at that time by approximately $106 million.

By March of 1991, it again became apparent to the Companies' officers that the Companies were going to have difficulty passing the 1991 year-end audit because of the Companies' $60 to $65 million deficit.[1] During this time, Dispenza claims that he began to

receive from Harris by e-mail fraudulent contract documents, including three sham contracts (the "sham contracts"). According to Dispenza, Harris told him that he should use the sham contracts for the 1991 audit. Dispenza included additional documents, such as copies of fictitious letters of credit, with the sham contracts, to make it appear as if the Companies had paid $48 million for oil cargoes, when, in fact, the Companies had not paid any money. The sham contracts added approximately $47 million to the assets of the Companies, and an additional $11 million was reflected as profits arising from the fictitious inventory. Relying on the false contracts, Ernst & Young again issued an unqualified opinion of financial condition to the Arochem Companies at the end of the 1991 audit. This opinion also was supplied to the banks.

### B. Violations of Financial Covenant

While the Companies were misleading the banks by providing them with false financial statements and borrowing base reports, they also were violating the agreement's financial covenant by maintaining highly speculative trading positions. The agreement between the Arochem Companies and the banks prohibited the Companies from holding a net unhedged position in oil of more than one million barrels. However, the Companies regularly violated this covenant. For instance, the Companies' net unhedged position was in excess of one million barrels approximately 80% to 85% of the time during the period January, 1990 through January, 1991. By November of 1990, the Arochem Companies were maintaining net unhedged positions of up to 10 million barrels of oil. The Companies never informed the banks that they were engaged in such highly speculative trading.

### C. Money Laundering

In October of 1990, Harris formed a new company, Arochem International, Ltd., ("Limited") in order to gain financing to support a contract that the Companies had entered into with the Nigerian government and

---

1. The Companies' deficit had decreased from its November 1990 level of approximately $103 million because, on January 16th and 17th of 1991, under Harris' direction, the Companies made approximately $40–50 million as a result of speculative oil trading.

to assist the Companies with financing when their credit became tight. The banks were aware of Limited's formation and were informed that Limited would be financed by Credit Lyonnais and Banque Paribas of Switzerland (together, the "Swiss Banks"). However, the banks required the Companies to obtain their permission before entering into financial transactions with Limited.

From October of 1990 through December of 1991, the Companies entered into numerous transactions with Limited without seeking the banks' permission. By the summer of 1991, the Swiss Banks were financing $100 to $200 million of the Companies' trading in oil markets. Dispenza testified that he and Harris discussed how such financing violated the agreement's financial covenants.

As a condition to providing financing, the Swiss Banks required a cash deposit as margin before they would issue letters of credit to finance Limited's transactions. According to Dispenza, in order to supply the cash, Dispenza and Harris decided to move money from the Companies' accounts at Chase Manhattan Bank, N.A. ("Chase") in New York to their accounts at Union Trust Company ("Union Trust") in Connecticut, and then transfer the funds to the Swiss Banks. The purpose of routing the money through Connecticut was to conceal from the banks that the financing they were supplying was being used by the Companies to acquire additional financing from the Swiss Banks. From April of 1991 through September of 1991, excluding the amount used for operating needs, $7,420,000 was moved from Chase to Union Trust, and $7,723,344.90 was then moved in the same period from Union Trust to the Swiss Banks. The Companies never informed the banks of these transactions.

### D. The Companies' Collapse

In December of 1991, the banks discovered that the Companies' assets and net worth

had been overstated by $40 to $60 million. On February 14, 1992, the banks filed a petition to force the Companies into bankruptcy. At this time, the Companies' deficit was about $192.8 million.

On September 9, 1992, the government filed a 24–count superseding indictment charging Harris with various financial crimes. Following a six-week jury trial, the jury returned a guilty verdict on all counts tried. Harris was sentenced on December 22, 1994, and he is currently serving his sentence.

### DISCUSSION

### 1. Ex Post Facto Claim

Harris contends that his conviction under the CFCE statute violated the Ex Post Facto Clause of the United States Constitution because the district court's charge to the jury permitted the jury to convict Harris on the basis of conduct that occurred prior to the CFCE statute's effective date, November 29, 1990.[2]

The Ex Post Facto Clause states that "[n]o ... ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. The Supreme Court has interpreted this clause as prohibiting Congress from passing a law that: (1) makes an act a crime that was legal when committed; (2) makes a crime greater than it was when it was committed; (3) increases the punishment for a crime after it has been committed; or (4) deprives the accused of a legal defense that was available at the time the crime was committed. *See Collins v. Youngblood*, 497 U.S. 37, 41–42, 110 S.Ct. 2715, 2718–19, 111 L.Ed.2d 30 (1990). While the Ex Post Facto Clause itself is a restraint on the legislative branch, its protections have been extended to the application of judicial

2. The CFCE statute, codified at 18 U.S.C. § 225 states:
   (a) Whoever—
     (1) organizes, manages, or supervises a continuing financial crimes enterprise; and
     (2) receives $5,000,000 or more in gross receipts from such enterprise during any 24–month period,
   shall be fined not more than $10,000,000 if an individual ... and imprisoned for a term of not less than 10 years and which may be life.

   (b) For purposes of subsection (a), the term "continuing financial crimes enterprise" means a series of violations under section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4 persons acting in concert.

precedent by the courts under the Due Process Clause of the Fifth Amendment. *Marks v. United States,* 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977).

It is well-settled that when a statute is concerned with a continuing offense, "the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of [the statute]." *United States v. Torres,* 901 F.2d 205, 226 (2d Cir.) (citation and quotation marks omitted), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *see also United States v. Duncan,* 42 F.3d 97, 104 (2d Cir.1994) (stating that "according to our precedents, continuing offenses such as conspiracy and bank fraud do not run afoul of the *Ex Post Facto* Clause if the criminal offenses continue after the relevant statute becomes effective"); *United States v. Campanale,* 518 F.2d 352, 365 (9th Cir.1975) (holding that "[i]t is well established that a statute increasing a penalty with respect to a criminal conspiracy which commenced prior to, but was continued beyond the effective date of the statute, is not *ex post facto* as to that crime"), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). Because the CFCE statute is a continuing crime statute, we must determine whether it was possible for the jury, following the district court's instructions, to convict Harris *exclusively* on pre-CFCE enactment conduct. After examining the jury instructions, we think that such a scenario was impossible.

The district court instructed the jury that, in order to convict Harris under the CFCE statute, it must find beyond a reasonable doubt that: (1) Harris committed three or more violations of the bank fraud and/or wire fraud statutes affecting a financial institution;[3] (2) the three or more bank fraud and/or wire fraud violations were part of a series of violations of these laws; (3) Harris undertook to commit this series of violations in concert with three or more other persons; (4) Harris organized, managed or supervised these three or more persons in connection

with this series of violations; and (5) Harris received $5 million or more in gross receipts from this series of violations during any 24-month period.

Of the nineteen counts of bank and wire fraud that the jury considered when determining whether Harris committed three or more violations, only one (Count Two) involved conduct by Harris that occurred before November 29, 1990—the effective date of the CFCE statute. Therefore, the jury must have found that two or more of the violations were based on post-CFCE enactment conduct.

Harris argues that the third and fourth elements of the jury charge, relating to the "in concert" and the "supervise[ ]" requirements, could have been satisfied completely by pre-CFCE enactment conduct. Specifically, Harris contends that the jury could have found that he acted in concert with and supervised three individuals in committing the pre-CFCE enactment conduct alleged in Count Two, but that he acted alone, and supervised no one in committing the additional violations which comprised the series.

In support of his argument, Harris relies on this court's decision in *Torres,* a case involving the operation of a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(a) and (b). *Torres,* 901 F.2d at 213. In *Torres,* the district court had failed to distinguish in its jury instructions between the defendant's pre-CCE enactment conduct and the defendant's post-CCE enactment conduct. *Id.* at 226. We held that, although it was unlikely that the jury had based its findings entirely on pre-CCE enactment conduct, because such a scenario was a possibility, the defendant's conviction had to be vacated. *Id.* at 229.

However, in the present case, there is no possibility that the jury relied entirely on the pre-CFCE enactment conduct in determining that the government satisfied the third and fourth elements of the district court's charge. In its instructions, the district court tied both the "in concert" and "supervise[ ]" require-

---

**3.** These violations were alleged in Counts Two through Eight (the bank fraud counts) and Counts 10 through 21 (the wire fraud counts).

ments to the series of violations. The district court instructed the jury as follows:

> The third element ... is that the defendant committed the *series of violations* ... in concert with three or more other persons....
>
> ... This element is satisfied if you find beyond a reasonable doubt that the defendant acted together with a total of at least three other persons to *commit the series* of bank fraud violations and/or wire fraud violations affecting a financial institution....
>
> ....
>
> The fourth element the government must prove ... is that the defendant organized, managed or supervised the three or more persons in committing the *series of violations*....

(emphasis added). Because the series of violations must have consisted of at least two violations based entirely upon post-CFCE enactment conduct, and because there is no ex post facto violation when a conviction is based partially on pre-CFCE enactment conduct, Harris' ex post facto claim as to the third and fourth elements of the charge is meritless.

In the fifth element of the charge, the jury was instructed that, in order to find Harris guilty, it must determine that he received $5 million or more in gross receipts from the series of violations during any 24–month period. Harris contends that this element of the charge was improper because it allowed the jury to consider, as part of the $5 million in gross receipts, money legitimately obtained by Harris prior to the enactment of the CFCE statute. We reject this argument.

■ First, like the third and fourth elements of the jury charge, the fifth element was tied to the series of violations. Thus, the jury must have considered post-CFCE enactment conduct—that is, money obtained by Harris after the enactment of the CFCE statute—when it determined that the government had satisfied the fifth element of the jury charge. We see no reason to depart from the settled rule that there is no ex post facto violation when conduct occurring before the enactment of the continuing crime statute is considered along with conduct occurring after the enactment of the statute simply because the conduct involves the obtaining of money. Moreover, Harris' argument that the district court should not have permitted the jury to consider any pre-CFCE earned money because it was legally earned by Harris is simply wrong. Any pre-CFCE enactment money the jury considered had to have been money obtained by Harris as a result of the series of violations consisting of wire and bank fraud, and therefore, this money was not legally earned.

■ For these reasons, Harris' CFCE conviction did not violate the Ex Post Facto Clause.[4]

### 2. Money Laundering Charge

The jury convicted Harris on Count Nine of the superseding indictment, which charged Harris with violating 18 U.S.C. § 1956(a)(2) by knowingly transferring proceeds of his bank fraud "from a place in the United States to or through a place outside the United States" in order "to conceal and disguise the nature, location, source and ownership of the proceeds."[5] Harris contends that

4. Arguably, in ascertaining that the jury was instructed to determine that each element of the CFCE violation occurred after the enactment of the CFCE statute, our analysis of the ex post facto issue exceeds what is required by *United States v. Alkins*, 925 F.2d 541 (2d Cir.1991). *Alkins* rejected an ex post facto claim because the defendants "permitted the *final element* of the crime to occur after the effective date of the statute." 925 F.2d at 549 (emphasis added). On the other hand, *Torres* deemed a sentence enhancement to have been an ex post facto violation when the jury instructions failed to require a determination that *both* of the applicable elements had occurred after the enactment of the

statute authorizing the enhancement. *See* 901 F.2d at 226–27. In any event, the resolution of any tension between *Alkins* and *Torres* can be left for another day, since the jury instructions in this case were valid under any reading of *Alkins* or *Torres.*

5. Section 1956(a)(2) of the money laundering statute states in relevant part:

> Whoever transports, transmits, or transfers ... funds from a place in the United States to or through a place outside the United States ... knowing that the ... funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful

his conviction on this count was improper because § 1956(a)(2) prohibits international transfers of funds, and the transfers he made to conceal funds were domestic.

The indictment stated that,

in order to conceal and disguise the nature, location, source and ownership of funds, [Harris] transferred approximately $7.5 million from the Arochem Companies' accounts at Chase Manhattan Bank in New York through the Union Trust Company in Connecticut and into the accounts held by Limited at Banque Paribas (Suisse) and Credit Lyonnais (Suisse) in Geneva, Switzerland, knowing that these funds were the proceeds of frauds on financial institutions.

Harris argues that each time that funds were sent to Switzerland, two transfers took place—one from New York to Connecticut and the other from Connecticut to Switzerland. Harris maintains that it was the transfers of funds from the Companies' Chase accounts in New York to its accounts at Union Trust in Connecticut that were designed to conceal the nature, location, source, and ownership of the funds from the banks, and not the transfers of funds from Connecticut to Switzerland. Therefore, Harris argues that he should not have been convicted of violating § 1956(a)(2).

■ We disagree because we do not interpret the movements of funds from New York to Connecticut and then from Connecticut to Switzerland as two separate events. While the scheme was implemented in two stages, each stage was an integral part of a single plan to transfer funds "from a place in the United States to or through a place outside the United States."

Furthermore, the district court's charge to the jury dispels any concerns that the jury considered each transfer of funds from New York to Switzerland as two transactions rather than one. In its jury instructions, the court stated:

To convict the defendant on this count, you must conclude that the particular movement of funds from the Arochem

companies' accounts at Chase through the companies' account at the Union Trust Company and to Arochem International Ltd.'s accounts in Switzerland was contemplated and executed as one transfer which was performed in two stages. If you conclude instead that the movement was in fact two independent transfers, then you may not convict the defendant on Count 9.

Because we consider Harris' movements of funds from New York to Switzerland as single transfers that served to conceal the location of the funds from the banks, we find no basis to disturb Harris' conviction for money laundering.

*3. Multiplicity*

In his indictment, Harris was charged with seven counts of bank fraud (Counts Two through Eight). Count Two related to the initial credit agreement between the Companies and the banks, while Counts Three through Eight related to the six subsequent extensions of the loan agreement. Harris contends that the six bank fraud counts, which corresponded to the six extensions of the agreement, should have been charged as a single count, and therefore that the district court erred when it refused to dismiss those counts as multiplicitous.

■ The doctrine of multiplicity "is based upon the double jeopardy clause of the Fifth Amendment, which 'assur[es] that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" *United States v. Fiore*, 821 F.2d 127, 130 (2d Cir.1987) (quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977)). While we have defined a multiplicitous indictment in general as "one that charges in separate counts two or more crimes, when in fact and law, only one crime has been committed," *United States v. Holmes*, 44 F.3d 1150, 1153–54 (2d Cir.1995), we have not addressed the issue of multiplicity in the contexts of numerous counts of bank fraud.

■ The bank fraud statute, codified at 18 U.S.C. § 1344, states in relevant part: "Who-

activity and knowing that such transportation is designed in whole or in part ... to conceal or disguise the nature, the location, the source,

the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of an offense].

ever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." The circuits that have addressed multiplicity in the context of bank fraud consistently have held that the bank fraud statute "punish[es] each execution of a fraudulent scheme rather than each act in furtherance of such a scheme." *United States v. Longfellow*, 43 F.3d 318, 323 (7th Cir.1994) (citation and quotation marks omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 2277, 132 L.Ed.2d 281 (1995); *see also United States v. Molinaro*, 11 F.3d 853, 859 (9th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 668, 130 L.Ed.2d 602 (1994); *United States v. Hord*, 6 F.3d 276, 281 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994); *United States v. Lemons*, 941 F.2d 309, 318 (5th Cir.1991); *United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir.), *cert. denied*, 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990). We agree with these circuits that the plain language of § 1344 "punish[es] each execution of a fraudulent scheme." *Longfellow*, 43 F.3d at 323 (citation and quotation marks omitted). Accordingly, we must determine whether Harris' alleged conduct constituted the execution of six separate schemes to defraud.

■ In determining whether acts constitute separate executions of a scheme, courts have considered whether the acts were chronologically and substantively independent from the overall scheme. *See United States v. Allender*, 62 F.3d 909, 912 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996); *United States v. Wall*, 37 F.3d 1443, 1447 (10th Cir.1994); *Molinaro*, 11 F.3d at 860. In the present case, the six separate extensions of the loan agreement were chronologically and substantively independent from the initial loan agreement. Although the initial loan agreement provided the criteria for the extensions, it nevertheless was an agreement for a limited time period.

At the end of the original credit agreement and at the end of each loan extension, the Companies had to ask the banks to extend the credit. In agreeing to extend the credit, the banks relied on the fraudulent monthly financial statements and borrowing base reports provided by Harris and the Companies. *See Longfellow*, 43 F.3d at 325 (holding that a fraudulent refinancing of a loan constituted a separate scheme to defraud the credit union, apart from the initial loan); *United States v. George*, 986 F.2d 1176, 1179–80 (8th Cir.) (holding that each submission to the bank of a fraudulent pledge of collateral for a loan from a line of credit was a separate execution of a scheme to defraud), *cert. denied*, —— U.S. ——, 114 S.Ct. 269, 126 L.Ed.2d 220 (1993). Accordingly, the bank fraud counts were not multiplicitous.

*4. Restitution*

Harris contends that the district court erred in ordering him to pay restitution to the banks in the amount of $200 million. Harris argues that the district court failed to consider his financial needs and earning potential, and that, by ordering Harris to pay such a large amount, the court placed an undue burden on Harris and his dependents.[6]

■ We review a district court's order of restitution for abuse of discretion. *United States v. Lavin*, 27 F.3d 40, 42 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 453, 130 L.Ed.2d 362 (1994). Before imposing restitution, 18 U.S.C. § 3664(a) requires that the district court "consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." While the court is not required to set forth detailed findings as to each factor, "the record must demonstrate that the court has considered these factors in ordering restitution." *United States v. Soto*,

---

6. Harris also argues that the district court erred in delegating its responsibility for setting a payment schedule to the probation department. The government concedes that this was erroneous, and, on remand the judgment should be corrected accordingly. *See United States v. Porter*, 41

F.3d 68, 71 (2d Cir.1994) (holding that sentencing court cannot "authoriz[e] a probation officer to make post-sentencing decisions as to either the amount of the restitution, or the scheduling of installment payments" (internal citation omitted)).

47 F.3d 546, 550 (2d Cir.1995) (citation and quotation marks omitted).

In the present case, the district court based its decision to order $200 million in restitution on the fact that, although unlikely, Harris potentially could earn $200 million in the future. Thus, if the court ordered restitution in a lower amount and Harris did earn that amount of money, the banks would be foreclosed from a full recovery of their losses due to double jeopardy. The district court concluded that the banks should not have to risk not recovering simply because it was unlikely that Harris would make this amount of money.

In *United States v. Khan,* 53 F.3d 507 (2d Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996), we held that the district court abused its discretion by failing to consider the financial resources of the defendants and the needs of the defendants' dependents before ordering the defendants to pay restitution. *Id.* at 519. In *Khan,* the district court, in making its restitution determination, had considered only the loss occasioned by each defendant. *Id.* Similarly, in the present case, the district court did not discuss Harris' obligations to his dependents. Instead, the district court focused exclusively on Harris' ability to pay and the losses incurred by the banks due to Harris' fraud.

Harris claims that, prior to his incarceration, he was providing for his two daughters, ages eight and twelve, his ex-wife, mother, and two sisters. The record does not indicate that the district court considered these alleged facts, or Harris' own financial needs, in making its restitution determination.

■ Although the district court properly was concerned about granting a small amount of restitution and then, due to double jeopardy, being barred from increasing the amount if Harris' financial situation subsequently improved, *see Porter,* 41 F.3d at 71, the record must still show that "the court has considered [the statutory] factors in ordering restitution." *United States v. Tortora,* 994 F.2d 79, 81 (2d Cir.1993). Here, the record does not indicate that the district court considered "the financial needs and earning ability of the defendant and [his] dependents."

18 U.S.C. § 3664(a). Therefore, we remand to the district court with instructions to consider all of the relevant factors in making its determination of restitution.

### 5. *Other Arguments*

■ Harris contends that he improperly was convicted for a violation of the CFCE statute because the statute was enacted for the sole purpose of prosecuting savings and loan plunderers and was not enacted to prosecute defrauders of commercial banks. However, nothing in the plain language and legislative history of the CFCE statute supports this narrow reading, and, therefore, we reject his argument.

■ Harris also argues that the district erred in denying his motion for a new trial, pursuant to Fed.R.Crim.P. 33, because new evidence that he discovered during trial conclusively demonstrated that Dispenza committed perjury when he testified at trial and that the government should have been aware of this. Even if we assume that Dispenza committed perjury and that the government was aware of it, Harris failed to make the requisite showing that "there [was] any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (citation and quotation marks omitted), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993). Accordingly, we reject Harris' argument that he is entitled to a new trial.

Finally, Harris argues that the district court erred in failing to depart downward from the Sentencing Guidelines range because the court refused to recognize that he suffered from a diminished mental capacity due to a pathological gambling disorder. The district court held a five-day *Fatico* hearing, *see United States v. Fatico,* 603 F.2d 1053, 1057 n. 9 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980), and concluded that Harris did not prove by a preponderance of the evidence that he suffered from a pathological gambling disorder. We do not think that the district court's determination was clearly erroneous. Furthermore, because Harris was

unable to prove that he suffered from a gambling disorder, we do not address the question of whether a pathological gambling disorder constitutes diminished mental capacity for the purpose of U.S.S.G. § 5K2.13.

## CONCLUSION

In view of the foregoing, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.