313 F.3d 803
 UNITED STATES of America, Appellee,
v.
DINERO EXPRESS, INC.; Luis Francisco Soriano, also known as "Luis Francisco Soriano," also known as Francisco Luis Soriano; Maria Y. Mendoza, Defendants,
Roberto Beras, also known as "Robert Silvestre," Defendant-Appellant.
 Docket No. 01-1634.
 United States Court of Appeals, Second Circuit.
 Argued November 22, 2002.
 Decided December 19, 2002.
 
 Andrew J. Ceresney, Assistant United States Attorney, Southern District of New York, New York, NY (James B. Comey, United States Attorney, on the brief; Robin L. Baker, Assistant United States Attorney, of counsel), for Appellee.
 David S. Zapp, New York, NY (Marjorie M. Smith, of counsel), for Defendant-Appellant.
 Before: F.I. PARKER, STRAUB, and RAGGI, Circuit Judges.
 STRAUB, Circuit Judge.
 
 
 1
 Defendant-Appellant Roberto Beras appeals from a November 28, 2001 judgment of the United States District Court for the Southern District of New York (Shirley Wohl Kram, Judge) convicting him, following a jury trial, of one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); one count of conspiracy to evade currency reporting requirements, in violation of 18 U.S.C. § 371; thirty-three counts of international money laundering, in violation of 18 U.S.C. §§ 2 and 1956(a)(2)(B); seven counts of money laundering, in violation of 18 U.S.C. §§ 2 and 1956(a)(3); thirty-three counts of evading currency reporting requirements by structuring financial transactions, in violation of 18 U.S.C. § 2 and 31 U.S.C. § 5324(a)(3); and seven counts of evading currency reporting requirements by causing a domestic financial institution to fail to file a currency transaction report, in violation of 18 U.S.C. § 2 and 31 U.S.C. § 5324(a)(1).
 
 
 2
 Beras raises a host of challenges to his convictions. All but one of these claims are disposed of by a summary order issued simultaneously with this opinion. We write here only to make clear that when an individual delivers a sum of money to the domestic office of a business entity — in this case, a licensed money remitter — and the foreign office of that entity pays out the same sum of money, minus commission, to the individual's associates located in that foreign country, the entity has engaged in a "transfer" of funds "from a place in the United States to ... a place outside the United States," as prohibited under 18 U.S.C. § 1956(a)(2).
 
 I.
 
 3
 At all relevant times, Beras served as co-owner and vice-president of Dinero Express, Inc. ("Dinero"), a licensed money remitter that specialized in transmitting money on behalf of customers in the United States to locations in the Dominican Republic and Puerto Rico. The evidence adduced at trial showed that between 1994 and 1996, Beras — in conjunction with other Dinero co-owners and officers — used Dinero and its employees in furtherance of an extensive international money laundering scheme. In exchange for commissions that generally totaled five percent of each transaction, Beras and his co-conspirators accepted from area drug traffickers cash deposits known to be the proceeds of illegal narcotics sales, and then, via a number of different techniques, arranged for the transport or transfer of those deposits from Dinero's headquarters in Manhattan to members of the traffickers' networks located in the Dominican Republic and Puerto Rico.
 
 
 4
 The laundering practice specifically at issue in this appeal involved the transfer of drug proceeds to the Dominican Republic under the guise of phony money remittances through a four-step process. First, drug traffickers delivered their cash to Dinero's New York headquarters for gradual deposit into the company's bank accounts in the United States. Second, Dinero remittance invoices were generated for fictitious transactions to the Dominican Republic; the invoices used false identities and addresses and were made out in amounts small enough to avoid currency reporting requirements.[1] Third, arrangements were made for a Dominican "peso supplier" to advance local currency — in the same amount as the original deposit delivered to Dinero's New York headquarters, minus commission — to Dinero's Dominican office, which in turn forwarded the cash to the drug traffickers' Dominican personnel under the pretense of fulfilling the fictitious remittances generated in New York. Fourth, the process culminated with Dinero's repayment of the peso supplier through a wire transfer of funds from Dinero's New York operating account to the peso supplier's bank accounts in the United States.
 
 
 5
 After a four-week trial, the jury returned a verdict convicting Beras on all eighty-two counts in the indictment. Beras was sentenced to 292 months' imprisonment, three years' supervised release, and a $4,100 mandatory special assessment, and was additionally subjected to an order of forfeiture in the amount of $10 million.
 
 II.
 
 6
 The international money laundering statute prohibits individuals from engaging, with the requisite intent or knowledge, in the
 
 
 7
 transport[], transmit[tal], or transfer[], or attempt[] to transport, transmit, or transfer [of] a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States....
 
 
 8
 18 U.S.C. § 1956(a)(2). Beras contends that because no individual step in the phony remittance scheme involved the direct wiring of money from the United States to the Dominican Republic, there was no "transfer" within the meaning of § 1956(a)(2) and thus his convictions thereunder were improper. We do not agree that such a narrow reading of § 1956(a)(2) is warranted.
 
 
 9
 To begin, we held in United States v. Harris, 79 F.3d 223, 231 (2d Cir.), cert. denied, 519 U.S. 851, 117 S.Ct. 142, 136 L.Ed.2d 89 (1996), that a multi-step plan to transfer money from one location to another should be viewed as a single "transfer" under § 1956(a)(2). Harris involved a two-step scheme in which the president of a petrochemical company first transferred funds from the company's New York bank accounts to the company's accounts in Connecticut, and then transferred the Connecticut funds to Swiss bank accounts. On appeal, we were asked to set aside the defendant's conviction for international money laundering on the ground that the only step in the scheme that actually served the purpose of concealing the source of the funds — the New York-to-Connecticut transfer — was entirely domestic. In rejecting that argument, we stated that
 
 
 10
 we do not interpret the movements of funds from New York to Connecticut and then from Connecticut to Switzerland as two separate events. While the scheme was implemented in two stages, each stage was an integral part of a single plan to transfer funds "from a place in the United States to or through a place outside the United States."
 
 
 11
 ....
 
 
 12
 ... Because we consider Harris' movements of funds from New York to Switzerland as single transfers that served to conceal the location of the funds from the banks, we find no basis to disturb Harris' conviction for money laundering.
 
 
 13
 Id. at 231. Harris thus requires that we view all of the steps in Beras' phony money remittance scheme as constituting a single event for purposes of § 1956(a)(2).
 
 
 14
 What remains is determining whether the remittance scheme, viewed as a whole, qualifies as a "transfer" of funds under § 1956(a)(2), even though no money was directly wired from the United States to the Dominican Republic. The ordinary meaning of the term "transfer" is "[t]o move or send to a different location." WEBSTER'S 3D NEW INT'L DICTIONARY 2427 (1993); see also Park 'N Fly v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). And as we have previously stated, the terms in the international money laundering statute must be considered "in light of the objects" to be transferred: money. United States v. Piervinanzi, 23 F.3d 670, 678 (2d Cir.), cert. denied, 513 U.S. 904, 115 S.Ct. 267, 130 L.Ed.2d 185 (1994). Because money is inherently fungible, a person is sensibly considered to have engaged in a "transfer" of money whenever he accepts money in one location and, pursuant to an overall course of conduct, causes the delivery of related money to another location. Cf. United States v. Gilboe, 684 F.2d 235, 238 (2d Cir.1982) (ruling that 18 U.S.C. § 2314 covers electronic transfers of funds because "[t]he manner in which the funds were moved does not affect the ability to obtain tangible paper dollars or a bank check from the receiving account" — i.e., "[t]he beginning of the transaction is the money in one account and the ending is money in another"), cert. denied, 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983).
 
 
 15
 This flexible and expansive reading of the term "transfer" is borne out in the legislative history. Prior to 1988, § 1956(a)(2) contained only the term "transport or attempts to transport" in describing the type of activity prohibited by the statute. See 18 U.S.C. § 1956(a)(2) (Supp.1987). Congress amended the statute by adding the terms "transmits" and "transfers." See Anti-Drug Abuse Act of 1988, Pub.L. No. 100-690, § 6471(b), 102 Stat. 4181, 4378 (Nov. 18, 1988). The purpose of the amendment — as set forth in a "section-by-section analysis" of the bill directed to "those who wish to know the intent of the drafters of this legislation" — was to "clarify that the term `transports' in the money laundering statute was intended to include electronic and other forms of movement of funds other than physical transportation." 134 Cong. Rec. S17367 (Nov. 10, 1998) (statement of Sen. Biden) (emphasis added). By focusing as a practical matter on the underlying "movement of funds," Congress ensured that law enforcement officials could continue enforcing § 1956(a)(2) in the face of increasingly sophisticated efforts by drug traffickers to hide the true character of their ill-gotten gains. Indeed, we have little doubt but that concealment was the primary motivation for why in this case Beras and his co-conspirators utilized the four-step remittance scheme rather than a single, direct wire transfer.
 
 
 16
 Accordingly, we hold that a course of conduct that begins with a sum of money located in one country and ends with a related sum of money located in another may constitute a "transfer" for purposes of § 1956(a)(2). This is true whether or not the particular transactional vehicle for effecting the "transfer" is comprised of a single step or a series, and whether or not the funds move directly between an account in the United States and one abroad. Because, at bottom, Beras' conduct enabled drug traffickers to move money located in New York to the Dominican Republic, we find no basis to disturb Beras' convictions for international money laundering under 18 U.S.C. § 1956(a)(2).
 
 III.
 
 17
 For the foregoing reasons, we AFFIRM the defendant's convictions for international money laundering under 18 U.S.C. § 1956(a)(2).
 
 
 
 Notes:
 
 
 [1]
 The purpose of this step was to disguise a single payment to and from Dinero of a sum of money in excess of the currency reporting threshold as multiple payments to and from Dinero, each for a sum well under the reporting threshold