**UNITED STATES of America,**

v.

**Yi Ching LIU, Defendant.**

**No. 02–CR–1003 (JBW).**

United States District Court, E.D. New York.

June 6, 2003.

Deborah A. Colson, The Legal Aid Society, Brooklyn, NY, for Defendant.

Bryan Rose, Brooklyn, NY, for Plaintiff.

## OPINION & ORDER

WEINSTEIN, Senior District Judge.

I. *Introduction*

The State encourages people to gamble, using Madison Avenue advertising tech-

niques to induce them to do so, and placing gambling outlets in thousands of convenient retail locations. The question presented is whether, when a person becomes a pathological gambling addict, partly as a result of this pervasive gaming atmosphere, and is driven to crime as a result of his addiction, the court may rely upon this pathology in downwardly departing under the United States Sentencing Guidelines ("U.S.S.G."). The answer is yes.

The court sentenced defendant Yi Ching Liu to 24 months of incarceration. The sentence was based in part on a four-point downward departure pursuant to United States Sentencing Guidelines to reflect Liu's pathological gambling addiction. U.S.S.G. § 5K2.13 (diminished capacity). This memorandum sets forth the legal and factual bases for this departure.

II. *Factual Background*

Defendant Yi Ching Liu was charged in an indictment with using unauthorized credit card convenience checks issued to others to obtain one thousand dollars or more during a one year period. 18 U.S.C. §§ 1029(a)(5), (c)(1)(B). He pled guilty.

An evidentiary hearing was conducted on the question of whether Liu was eligible for a downward departure for diminished capacity based on his gambling addiction. His expert witness was Stephen Block, a psychotherapist at the Saint Vincent Catholic Medical Centers' Gamblers Treatment Center, whose testimony satisfied *Daubert*. *See* Fed.R.Evid. 702, 703. Mr. Block holds a national certification as a gambling treatment counselor and a New York State certification as a gambling treatment supervisor. *See id.* at 18. He testified that he had assessed Liu's condition using the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM IV"). The DSM IV's criteria for pathological gambling are as follows:

(1) is preoccupied with gambling (e.g., preoccupied with reliving past gambling experiences, handicapping or planning the next venture, or thinking of ways to get money with which to gamble).

(2) needs to gamble with increasing amounts of money in order to achieve the desired excitement.

(3) has repeated unsuccessful efforts to control, cut back, or stop gambling.

(4) is restless or irritable when attempting to cut down or stop gambling.

(5) gambles as a way of escaping from problems or of relieving a dysphoric mood (e.g., feelings of helplessness, guilt, anxiety, depression).

(6) after losing money gambling, often returns another day to get even ("chasing" one's losses).

(7) lies to family members, therapist, or others to conceal the extent of involvement with gambling.

(8) has committed illegal acts such as forgery, fraud, theft, or embezzlement to finance gambling.

(9) has jeopardized or lost a significant relationship, job, or educational or career opportunity because of gambling.

(10) relies on others to provide money to relieve a desperate financial situation caused by gambling.

A score of five or more indicates a diagnosis of pathological gambling. *See* May 15 Tr. at 19–20. Liu had a perfect score—ten out of ten. *See id.* at 20.

Mr. Block explained that pathological gamblers have a "persistent and progressive need to gamble and [are] unable to stop or control once they begin to gamble [ ... ]." *Id.* at 21. Pathological gambling as an impulse control disorder has been recognized by the American Psychiatric Association since 1980. *See id.* at 20. The expert noted that Liu's illegal activities

started only after he exhausted his personal funds and savings; he found a "direct connection between [Liu's] illegal activity and his gambling." *Id.* at 21. Approximately 30–40% of pathological gamblers are involved in illegal activity to support their gambling addiction, according to the witness. *See id.* at 22.

Liu's wife testified that her husband had been a habitual gambler since the 1980's, and that he tried to hide his gambling addiction from her. *See id.* at 31–32. She detailed the ways in which Liu's gambling activities had had a deleterious effect on her and their children. *See id.* at 33.

Mr. Liu acknowledged that gambling had become a "very serious disease for me." *Id.* at 35. He pointed out that his previous attempts to receive gambling treatment were unsuccessful partly because of the lack of Chinese-language programs. *See id.* at 35.

An assessment and evaluation of Liu has been prepared by Mr. Block. *See* Exhibit C of Liu's brief of May 9, 2003 ("Assessment"). The Assessment concludes that Liu's "preoccupation with gambling led him to ignore family responsibility and ultimately to commit illegal acts to finance his continued gambling." Assessment, at 4. The expert concluded that the fact that Liu was unable to stop gambling even when he was caught in illegal activity is "typical of the pathological gambler." Noted was the fact that Liu exhausted his savings and made legitimate loans to finance his gambling before resorting to illegal activities. Mr. Block concluded that the charged "illegal activity was tied into obtaining funds with which to gamble." *Id.* at 4. None of defendant's crimes were violent.

By a preponderance of evidence defendant proved a pathological gambling addiction which he had tried unsuccessfully to control and which had led to the crime in question. Accordingly, a four-point downward departure was granted, leading to imposition of the minimum sentence permitted, 24 months of incarceration. The minimum term of incarceration was chosen because defendant has otherwise been a good husband, father, and hard worker who will benefit from the treatment for this addiction ordered by the court.

## III. *Legal Analysis*

A sentencing court may downwardly depart if the defendant suffers from diminished capacity. U.S.S.G. § 5K2.13. The provision reads:

> A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense [involving obscenity, sex abuse, sexual exploitation of children, or trafficking in children]. If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

By a preponderance of the evidence defendant proved—and it is not disputed—that exceptions (1)-(4) above do not apply to Liu. *See* May 15 Tr. at 41–42. Liu was potentially eligible for a downward depar-

ture under this provision if he committed the offense while suffering from a significantly reduced mental capacity.

Curiously, the term "significantly reduced mental capacity" was not originally defined. In 1998 the Sentencing Commission remedied this oversight and added Application Note 1, which defines this term:

"Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.

Liu does not argue that he did not know that fraud was wrongful. Instead, he has shown that his pathological gambling addiction impaired his ability to control behavior that he knew was wrong.

There is a dearth of cases addressing the question of whether a pathological gambling addiction can constitute a significantly reduced mental capacity under section 5K2.13 of the United States Sentencing Guidelines. One of the few decisions to squarely address the question is *United States v. Harris*, No. S192 Cr. 455(CSH), 1994 WL 683429 (S.D.N.Y. Dec. 6, 1994). In that case, the defendant sought a downward departure for an alleged pathological gambling addiction. In considering whether such an addiction might constitute a basis for a downward departure, the court noted the discussion of pathological gambling in the DSM IV, "the psychiatric profession's diagnostic Bible." *Harris*, 1994 WL 683429, at *4 (quoting *The New York Times*, April 19, 1994). In light of the fact that the DSM IV characterizes pathological gambling as an impulse control disorder, the *Harris* court was "not prepared to exclude that disorder, as a matter of law, from consideration under the diminished

capacity provisions of § 5K2.13." *Id.* at *4. Absent a contrary holding by the Court of Appeals for the Second Circuit, the *Harris* court held that a "pathological gambling disorder, if proven by a defendant to exist and to have resulted in a significantly reduced mental capacity contributing to the commission of the offense of conviction, may qualify in law as a form of 'diminished capacity' under § 5K2.13." *Id.* at *4.

Although *Harris* found that a defendant with a pathological gambling addiction could potentially be awarded a downward departure on the basis of diminished capacity, it found that the particular defendant in question was not entitled to such a departure. The reason was that the "gambling activities" in *Harris* consisted of "compulsive trading in commodities options, primarily oil futures." *Id.* at *5. After a *Fatico* hearing, the trial court determined that such transactions did not constitute gambling activities. On appeal, the court of appeals affirmed the district court's finding that commodity trading did not constitute gambling. *See United States v. Harris*, 79 F.3d 223 (2d Cir.1996). It explicitly declined to rule on whether a pathological gambling disorder can constitute diminished mental capacity for the purposes of section 5K2.13. *See id.* at 234.

Significantly, *Harris* was decided before the 1998 amendment defining "diminished mental capacity." The Court of Appeals for the Second Circuit has not determined whether a pathological gambling addiction can constitute diminished mental capacity under the 1998 definition of that term. Such a determination has, however, been made in the Sixth Circuit. *See United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000). The *Sadolsky* court considered whether a pathological gambling addiction could constitute a basis for "significantly reduced mental capacity" as that term is used in post–1998 section 5K2.13. It noted

that in a prior 1991 decision, *United States v. Hamilton*, 949 F.2d 190 (6th Cir.1991), it had held that a pathological gambling addiction did not form a basis for "significantly reduced mental capacity" because the defendant in that case "was able to absorb information in the usual way and to exercise the power of reason. He took to selling drugs illegally not because of any inability to understand his situation, but because he needed money." *Hamilton*, 949 F.2d at 193.

The *Sadolsky* court held that *Hamilton* no longer rules. *See Sadolsky*, 234 F.3d at 942. Its decision was based on the fact that *Hamilton* turned on whether or not a pathological gambling addiction presented a cognitive impairment. The 1998 amendment defining "significantly reduced mental capacity" clarifies the law: now either a cognitive or volitional impairment will suffice. *See Sadolsky*, 234 F.3d at 942. The *Sadolsky* court also noted that section 5K2.13 does not differentiate between instances in which the reduced mental capacity explain the behavior that constituted the crime or motivated the crime. *See id.* at 943. A "significantly reduced mental capacity must be a *contributing* cause of the offense, but need not be the *sole* cause." *Id.* at 943 (quoting *United States v. McBroom*, 124 F.3d 533, 548 n. 14 (3d Cir.1997)).

■ The language of the provision as well as precedent support the view that a pathological gambling addiction may constitute "significantly reduced mental capacity" under section 5K2.13. The ruling that a pathological gambling addiction may constitute such a reduced mental capacity, left undisturbed in *Harris*, is bolstered by the 1998 amendment.

■ Based on the testimonial and documentary evidence presented, defendant Liu has proved by a preponderance of evidence that he suffered from a pathologi-

cal gambling addiction, evidenced by participation in state-operated numbers games and other forms of gambling, that this condition constituted an impulse control disorder, and that this disorder led to the crime. The disorder interfered with Liu's ability to control behavior that he knew was wrongful. *See* U.S.S.G. § 5K2.13, Application Note 1. A downward departure is appropriate.

## IV. Support for Plausibility of Claim Dehors the Record

Mr. Liu's pathological gambling addiction has done irreparable damage to his life and the life of his family. While his story is tragic, it is hardly unique, or even unusual.

The general social milieu lends support to the specific factual finding of Liu's disease. New York State leads the nation in percentage of problem gamblers. *See* Kate Gurnett, *Hidden Addiction, Scant Treatment*, Times Union, Jan. 13, 2003, *available at* **http://www.timesunion.com/** aspstories/storyprint.asp?storyID=92152. An estimated 1.2 million New Yorkers suffer from gambling problems, up 73 percent in the ten years between 1986 and 1996. *See id.* Roughly 90 percent of New York's adults gamble, spending an estimated $8 billion per year. *See* Kate Gurnett, *Gambling Fever Ups the Ante*, Times Union, January 12, 2003, *available at* http://www.timesunion.com/aspstories/storyprint.asp?storyID =91952. These statistics from New York illustrate a national trend: Americans now spend more on gambling than on movies, videos and DVDs, music and books combined. *See* Alex Berenson, *The States Bet More on Betting*, New York Times, May 18, 2003, at Section IV, p. 1. The states are increasingly making gambling easier and

encouraging it in order to increase their revenue from their "take" of the proceeds. *See id.; cf.* Dictionary of American Slang 546 (3d ed., Robert L. Chapman & Barbara Ann Kipfer, eds.1995) ("take" is the money taken in at a gambling casino). With an annual growth rate of 9 percent since 1991, gambling is increasing substantially faster than the economy as a whole. *See* Berenson, *supra*, at 1.

This mushrooming of the gambling industry is fed by, and leads to, staggering losses by the gamblers themselves. Since 1991, when the current wave of legalization began, the annual estimated cost to Americans of all betting, including lotteries, casinos, and racetracks, has risen from $27 billion to $68 billion. *See id.* at 1. These expenditures correlate with a variety of deleterious effects on individuals and families. As Mr. Block, the expert, noted:

> There's an increase in things like divorce, separation. There's an increase in bankruptcies. There's an increase in domestic violence. There's an increase in isolation and alienation from the family and there certainly is an effect in the same way that the alcoholic family or the drug-addicted family is impacted by the activity of the addict.

May 15 Tr., at 25–26.

In an appreciable number of cases, the combination of depression and financial disaster has led gambling addicts to suicide. *See, e.g.,* Kate Gurnett, *Hidden Addiction, Scant Treatment,* Times Union, Jan. 13, 2003 ("[n]early one in four compulsive gamblers attempts suicide"); *The Hidden Addiction,* editorial, Times Union, Jan. 19, 2003; *Dear Officer ... Please Kill Me,* New York Post, Nov. 17, 1997 (reporting suicide of 19 year-old who had accrued $6,000 in gambling debts); Jim Suhr, *Gambler Kills Family, Himself,* Assoc. Press, Nov. 22, 2000.

In its last fiscal year, New York grossed some $4.75 billion in lottery sales. *See* Kate Gurnett, *Hidden Addiction, Scant Treatment,* Times Union, Jan. 13, 2003. In October 2002, a law was enacted that will increase the availability of casinos. *See* May 15 Tr., at 24. Earlier this month, it was proposed that as many as 4,500 video lottery terminals be added to three large off-track betting outlets in New York City. *See* Alex Berenson, *The States Bet More on Betting,* New York Times, May 18, 2003. Video lottery terminals are "extremely efficient revenue collectors from the point of view of state governments, as opposed to local economies." Alex Berenson, *The States Bet More on Betting,* New York Times, May 18, 2003. It is projected that by 2006, New York will become a "gamblers' paradise" with eight casinos, eleven racetracks, a multistate lottery, up to 5,000 Quick Draw outlets and 10,000 video slot machines. Kate Gurnett, *Gambling Fever Ups the Ante,* Times Union, Jan. 12, 2003.

Last year, New York State spent $60,000,000 to advertise its lottery. *See* Letter from Stephen Block, May 19, 2003. The state budgeted $1,700,000 for gambling prevention, treatment, and education, or roughly $1.41 per estimated gambling addict. *See id.* This $1.7 million corresponds to thirty-six thousandths of a percent of the State's lottery revenue (.000358).

To George Washington's aphorism that gambling is "the child of avarice, the brother of iniquity, and the father of mischief," must now be added, "and the foundation for state government finances." George Washington, Letter of Jan. 15, 1783, *quoted in* American Heritage Dictionary of American Quotations 207 (Margaret Miner & Hugh Rawson eds., 1997).

V. *Conclusion*

Defendant Liu is granted a four-point downward departure to reflect his signifi-

cantly reduced mental capacity caused by his pathological gambling addiction. U.S.S.G. § 5K2.13.

SO ORDERED.