*United States v. Ho*

United States Court of Appeals
For the Second Circuit

_____

August Term 2019

Argued:  March 11, 2020
Decided:  December 29, 2020

No. 19-761

_____

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

CHI PING PATRICK HO, AKA PATRICK C.P. HO,

*Defendant-Appellant*.

_____

Appeal from the United States District Court
for the Southern District of New York
No. 17-cr-779, Loretta A. Preska, *Judge*.

_____

Before:  RAGGI, CHIN, AND SULLIVAN, *Circuit Judges*.

Defendant-Appellant Chi Ping Patrick Ho appeals his conviction after trial in the Southern District of New York (Preska, *J.)* on charges of conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), conspiracy to commit money laundering, substantive money laundering, and violations of the FCPA.  Ho argues that (1) the evidence was insufficient to support his FCPA conviction under

15 U.S.C. § 78dd-2; (2) the district court erroneously instructed the jury that a violation of § 78dd-3 constituted specified unlawful activity that could support a money laundering conviction; (3) the wires at issue in his money laundering conviction did not go "to" or "from" the United States as required to convict; (4) the district court abused its discretion in admitting certain evidence at trial; and (5) the indictment was invalid because it contained material contradictions and charged Ho under mutually exclusive sections of the FCPA. We reject each of Ho's arguments and affirm the district court's judgment in all respects.

AFFIRMED.

BENJAMIN E. ROSENBERG, Dechert LLP, New York, New York (Katherine M. Wyman, Dechert LLP, New York, New York, Edward Y. Kim, Jonathan F. Bolz, Krieger Kim & Lewin LLP, New York, New York, *on the brief*), *for Defendant-Appellant* Chi Ping Patrick Ho.

DOUGLAS ZOLKIND, Assistant United States Attorney (Daniel C. Richenthal, Catherine E. Ghosh, Anna M. Skotko, Assistant United States Attorneys, *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, Paul A. Hayden, Trial Attorney, Fraud Section, Criminal Division, United States Department of Justice, *on the brief*), *for Appellee* United States of America.

RICHARD J. SULLIVAN, *Circuit Judge*:

Defendant-Appellant Dr. Chi Ping Patrick Ho, a citizen of Hong Kong, appeals from a judgment of conviction entered March 27, 2019, in the United States District Court for the Southern District of New York (Preska, *J.*), following a jury

trial. The indictment principally alleged that Ho, as an officer or director of a U.S.-based organization, paid bribes on behalf of a Chinese company to the leaders of Chad and Uganda in exchange for commercial advantages. The jury convicted Ho on seven counts charging violations of and conspiracy to violate two provisions of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-2 and 78dd-3, and the money laundering statute, 18 U.S.C. § 1956(a)(2)(A). Judge Preska sentenced Ho to 36 months' imprisonment and imposed a fine of $400,000.

On appeal, Ho challenges his conviction on several grounds, maintaining that (1) there was insufficient evidence supporting his convictions under § 78dd-2 of the FCPA; (2) a violation of § 78dd-3 of the FCPA is not a specified unlawful activity under the money laundering statute; (3) the money laundering statute does not cover a transaction that merely goes "through" correspondent bank transfers in the United States; (4) the district court abused its discretion in admitting certain evidence at trial; and (5) the indictment was defective as it contained material contradictions and charged Ho under mutually exclusive sections of the FCPA. For the reasons set forth below, we reject each of Ho's challenges and affirm the district court's judgment.

3

## I. BACKGROUND[1]

The evidence at trial established that Ho used his position as an officer or director of a U.S.-based non-governmental organization ("NGO") to engage in two bribery schemes for the benefit of China CEFC Energy Company Limited ("CEFC Energy"), a for-profit conglomerate based in Shanghai. CEFC Energy funded a non-profit NGO in Hong Kong known as the China Energy Fund Committee, or CEFC Limited ("CEFC NGO"). That entity, in turn, funded a non-profit U.S. entity, China Energy Fund Committee (USA) Inc. (the "U.S. NGO"), which was incorporated in Virginia, where it had an office, and which used a suite affiliated with CEFC Energy in Trump World Tower in New York. A former employee of CEFC NGO testified that CEFC NGO treated the U.S. NGO as the U.S. arm of its organization. *See* App'x at 194–204; *see also* discussion *infra* Section III.A. Beyond funding the U.S. NGO, CEFC NGO held itself out as an organization "headquartered in Hong Kong" with an office "in the United States," App'x at 731, and touted itself as a "Chinese think tank registered in Hong Kong and also in the

---

[1] Because Ho appeals his conviction following a jury trial, we recite the facts from the trial evidence "in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor." *United States v. Napout*, 963 F.3d 163, 168 (2d Cir. 2020) (internal quotation marks omitted).

USA as a public charity," with "special consultative status" with the United Nations, *id.* at 592.

Ho served as an officer and the principal director of CEFC NGO, holding the title of Secretary General. He was also an officer and director of the U.S. NGO, and ran the daily operations of both entities. As part of his work with CEFC NGO (including through the U.S. arm), Ho often visited the United Nations and made contacts with high-ranking officials, including Presidents of the UN General Assembly, to help CEFC Energy find business opportunities. As relevant to this case, Ho engaged in two schemes – the "Chad scheme" and the "Uganda scheme" – to advance CEFC Energy's commercial interests.

## A. Chad Scheme

Around September 2014, a CEFC Energy official asked Ho to arrange a meeting with the President of Chad, Idriss Déby ("Déby"), to help CEFC Energy pursue business in Chad. Ho agreed and asked a former President of the UN General Assembly, Vuk Jeremić, for an introduction to Cheikh Gadio, a former Foreign Minister of Senegal who knew Déby. Jeremić contacted Gadio and suggested that he meet Ho, his "friend[] from China who was doing a lot of work with the United Nations" and working at a Chinese oil company. App'x at 250.

Gadio and Ho eventually met at the Trump World Tower suite used by CEFC Energy and the U.S. NGO. There, Ho explained CEFC Energy's interest in Chad and sought Gadio's assistance in gaining access to Déby. Gadio agreed to help set up meetings between CEFC and Déby. In late October 2014, Gadio met with Déby in Chad, and advised Ho that Déby was interested in working with CEFC Energy.

Later that year, Ho and a delegation from CEFC Energy met with Déby in Chad on several occasions. At the first meeting, in November 2014, Déby invited CEFC Energy to consider an opportunity to acquire an oilfield in Chad. He noted that other oil companies were interested in that block and suggested next steps to enable CEFC Energy to advance a bid. About a week later, Ho asked Gadio to arrange another meeting with Déby. Gadio advised against a second meeting at that time, but in the face of Ho's insistence, set up the meeting.

The second meeting took place on December 8, 2014, at Déby's presidential compound and involved a delegation from CEFC Energy, Ho, Gadio, and Gadio's son and business partner, Boubker Gadio, as well as Déby and his chief of staff. The participants discussed the Chadian oilfield opportunity, and at the end of the meeting, the CEFC delegation presented Déby with wrapped gift boxes. Déby did

6

not open the boxes until after the meeting; when he did, he found that the boxes contained $2 million in cash. Déby called Gadio – who by this time had gone back to his hotel – and demanded that he return to the compound.

When Gadio arrived, Déby expressed outrage that the boxes contained cash. Déby asked Gadio if he knew in advance about the cash gift, and Gadio responded that he did not. At Déby's request, Ho, Gadio, and the CEFC delegation met with Déby and his chief of staff the next day, December 9, 2014. At that meeting, Déby expressed shock and anger at receiving cash, and explained that he did not know "why people believe all African leaders are corrupt." *Id.* at 300.

Ho responded that he was "very impressed by [Déby's] reaction and . . . attitude," *id.* at 301, while members of the CEFC delegation insisted that the cash had been intended as a donation to the country, not as a bribe to Déby. Déby replied that "donations are not made this way" and again refused to accept the cash. *Id.* at 304. Ultimately, the delegation promised a formal letter of donation to be used for Chad. Ho subsequently drafted a letter to that effect, which Gadio revised and delivered to Déby.

In exchange for setting up the meetings in Chad, Gadio sought a written contract with CEFC Energy to formalize his role and ensure his compensation for

7

assisting the company in acquiring business in the Chadian oilfields. After the December trip, Boubker Gadio sent a text message to his father asking if he had received "any feedback from our friends in China" regarding the contract. *Id.* at 736; *see also id.* at 307. Gadio answered, "No[,] our Chinese friends are strange! Let us give them another week. Otherwise we will go to Chad [in] early January and destroy their reputation and strategies in Chad!" *Id.* at 736; *see also id.* at 307–08. Boubker responded, "I sincerely think they will reply favorably . . . [.] [T]heir attempt to buy the president to put us to the side did not work. Big companies don[']t like middle men . . . but they don[']t have a choice with us." *Id.* at 736 (first ellipsis in original). Ultimately, CEFC NGO paid Gadio $400,000 for his work in Chad. Nevertheless, despite Gadio's connections and Ho's efforts to negotiate a deal for oil rights, the parties failed to secure a deal.

## B. Uganda Scheme

Also in 2014, Ho sought an introduction to Sam Kutesa – the Minister of Foreign Affairs for Uganda, who had recently begun a one-year term as the President of the UN General Assembly – for the purpose of helping CEFC Energy develop business in Uganda's oil fields. Ho contacted Kutesa's office at the UN in New York and introduced himself as the "Deputy Chairman and Secretary

8

General" of CEFC NGO, "a Chinese think tank registered in Hong Kong and also in the USA as a public charity" with "special consultative status from UN's Economic and Social Council." App'x at 592.

Around February 2016 – by which time Kutesa had completed his term as President of the General Assembly and returned to Uganda as Foreign Minister – Kutesa, through his wife, solicited a bribe from Ho to be disguised as a payment to a charitable foundation. Ho requested, and ultimately received, authorization from the chairman of CEFC Energy to make a half million dollar payment to Kutesa's charity. Ho then contacted Kutesa to advise him that the payment would be made and to procure an invitation to the inauguration of Ugandan President Yoweri Museveni, who was Kutesa's brother-in-law. Ho told Kutesa that he would bring executives from CEFC Energy to discuss business opportunities in Uganda.

On May 5, 2016, Ho caused a wire transfer of $500,000 to be sent from CEFC NGO to an account belonging to the Food Security and Sustainable Energy Foundation at Stanbic Bank in Kampala, Uganda, as a donation to the foundation designated by the Kutesas. Specifically, the wire originated "from HSBC Hong Kong on behalf of CEFC [NGO] as the originator, through to HSBC Bank US as the

9

US correspondent for credit to Deutsche Bank in New York[,] US as a correspondent for the beneficiary bank Stambic [sic] Bank in Uganda, for final credit to the beneficiary Food Security and Sustainable Energy Foundation." *Id.* at 400. Ho and a CEFC Energy delegation attended the inauguration in May 2016, and met with Museveni, Kutesa, and others. After the trip, Ho emailed the Kutesas and reiterated that CEFC Energy was anxious to partner with the Kutesas' family businesses. About five months later, Kutesa's wife told Ho about a confidential opportunity to acquire a Ugandan bank. Ho referred the matter to another CEFC Energy executive to handle, but it appears that CEFC Energy ultimately did not complete a deal in Uganda.

## II. PROCEDURAL HISTORY

In 2017, a grand jury in the Southern District of New York returned an indictment charging Ho with eight crimes: conspiracy to violate the FCPA in violation of 18 U.S.C. § 371 (Count One); violation of FCPA § 78dd-2 with respect to the Chad scheme (Count Two); violation of FCPA § 78dd-2 with respect to the Uganda scheme (Count Three); violation of FCPA § 78dd-3 with respect to the Chad scheme (Count Four); violation of FCPA § 78dd-3 with respect to the Uganda scheme (Count Five); conspiracy to commit money laundering in violation of 18

10

U.S.C. § 1956(h) (Count Six); money laundering in violation of 18 U.S.C. § 1956(a)(2)(A) with respect to the Chad scheme (Count Seven); and money laundering in violation of 18 U.S.C. § 1956(a)(2)(A) with respect to the Uganda scheme (Count Eight).

Ho moved to dismiss Count One and Counts Four through Eight of the indictment on April 16, 2018. As to Counts One, Four, and Five, Ho argued that because the indictment contained language stating that he was a domestic concern under § 78dd-2, he could not also be charged with violating or conspiring to violate § 78dd-3, which does not apply to domestic concerns. In seeking to dismiss Counts Six through Eight, Ho asserted, among other things, that the text of the money laundering statute precluded the government from arguing that "the wires went from Hong Kong to the United States, and then from the United States to . . . Uganda." No. 17-cr-779 (LAP), Doc. No. 63 at 13. The district court denied the motion, explaining, as to the FCPA counts, that charging Ho under both §§ 78dd-2 and 78dd-3 was not inconsistent. Turning to the money laundering counts, the court found that the indictment was technically sufficient because "it alleges that the defendant transmitted funds both to the United States and from the United States," Special App'x at 13, and that a wire transfer from Hong Kong to a

11

correspondent bank in New York, to another bank in New York, and then, to an international destination would be "clearly sufficient under . . . *United States v. Daccarett*, 6 F.3d 37, 54 (2d Cir. 1993)." Special App'x at 14.

Trial began on November 26, 2018 and ended on December 5, 2018, when the jury returned guilty verdicts against Ho on Counts One through Six and Count Eight, while acquitting him on Count Seven. On December 18, 2018, Ho moved for a judgment of acquittal on all counts of conviction under Rule 29(c), "[i]n order to preserve all arguments as to the sufficiency of the evidence to convict." No. 17-cr-779 (LAP), Doc. No. 218. The district court denied that motion, and ultimately sentenced Ho to 36 months' imprisonment, and fined him $400,000. Ho is currently serving his sentence.

## III. DISCUSSION

Ho raises several arguments on appeal. First, Ho contends that there was insufficient evidence to establish that he acted on behalf of a "domestic concern," as required to convict under § 78dd-2 of the FCPA. Second, he asserts that the jury was improperly instructed that a violation of § 78dd-3 could serve as specified unlawful activity supporting his money laundering convictions. Third, Ho maintains that the money laundering statute, which covers wire transfers that go

12

"to" or "from" the United States, does not reach a transaction that merely involves the use of correspondent banks in the United States, where the transfer originated in Hong Kong and concluded in Uganda. Fourth, Ho argues that the district court abused its discretion by admitting certain out-of-court statements and summary charts into evidence. Fifth, Ho contends that the district court should have struck Counts One, Four, and Five because the indictment contained material contradictions that rendered those counts legally defective and because the indictment charged Ho under two mutually exclusive sections of the FCPA, §§ 78dd-2 and 78dd-3. We address each argument in turn.

## A. The Evidence Supports Ho's Convictions Under 15 U.S.C. § 78dd-2 (Counts Two And Three)

As relevant here, 15 U.S.C. § 78dd-2 prohibits an officer or director of a "domestic concern" from offering or paying bribes to a foreign official to gain "any improper advantage," "in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person." 15 U.S.C. § 78dd-2(a).[2] A domestic concern includes an entity that has a "principal place of

---

[2] The statute defines the term "person" to include a company. *See* 15 U.S.C. § 78c(a)(9).

13

business in the United States" or that "is organized under the laws of a State of the United States." *Id.* § 78dd-2(h)(1).

Ho challenges the sufficiency of the evidence underlying his § 78dd-2 convictions on Counts Two and Three, arguing that "no rational trier of fact could have found the essential elements of [a § 78dd-2 violation] beyond a reasonable doubt, because there was no evidence that Ho was acting to assist any domestic concern." Ho Br. at 20 (internal quotation marks omitted). Drawing on the government's argument at trial that "Ho's actions were undertaken to benefit . . . two foreign entities," Ho maintains that the government's theory of the case precluded the jury from finding that Ho assisted a domestic concern. *Id.* at 20–21. According to Ho, "at most" the jury could find that Ho "worked for" the Hong Kong-based CEFC NGO to arrange meetings between CEFC and Ugandan officials that benefited CEFC Energy, and that he "worked on behalf of" CEFC Energy to facilitate the Chad sale; but he contends that the government provided "no proof" that the U.S. NGO "did anything relevant to the allegations in the case." *Id.* at 21–22.

"We review sufficiency of evidence challenges *de novo*, but defendants face a heavy burden," because our framework for evaluating such challenges "is

14

exceedingly deferential." *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018) (internal quotation marks omitted). This is "because a reviewing court must sustain the jury's guilty verdict if viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (internal quotation marks omitted). In conducting this inquiry, we must "credit[] every inference that could have been drawn in the [g]overnment's favor," *Baker*, 899 F.3d at 129 (second alteration in original) (internal quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Further, we are mindful that "the jury is entitled to base its decision on reasonable inferences from circumstantial evidence." *United States v. Rahman*, 189 F.3d 88, 123 (2d Cir. 1999).

In challenging the sufficiency of the evidence supporting his § 78dd-2 convictions, Ho makes much of the fact that the U.S. NGO was not the ultimate object of Ho's assistance. The statutory language, however, does not require that the domestic concern itself be the ultimate object of the assistance. Rather, the statute precludes officers and directors of domestic concerns from paying bribes

to foreign officials "in order to assist such domestic concern in obtaining . . . business *for . . . any* person." 15 U.S.C. § 78dd-2(a) (emphasis added); *accord United States v. Ng Lap Seng*, 934 F.3d 110, 145 (2d Cir. 2019) (explaining that the FCPA "prohibits bribery designed to obtain, retain, or direct business not only *for* or *to* the briber, but *for* or *to* 'any person'"). Notably, the statute addresses the goal of corruptly assisting a domestic entity in obtaining business either "for *or* with" another company, suggesting that the domestic concern need not itself be seeking to obtain business "with" that company. 15 U.S.C. § 78dd-2(a) (emphasis added); *see also United States v. Kay*, 359 F.3d 738, 755–56 (5th Cir. 2004) (explaining that "Congress was concerned about both the kind of bribery that leads to discrete contractual arrangements and the kind that more generally helps a domestic payor obtain or retain business *for* some person in a foreign country." (emphasis added)). Similarly, the phrase "directing business to" is followed by the phrase "any person," which again shows that the statute is not solely concerned with entities or persons steering business toward themselves. *See* 15 U.S.C. § 78dd-2(a). After all, as we have recognized, "the FCPA prohibits commercial bribery without regard to whether the briber himself profits directly from the business obtained." *Ng Lap Seng*, 934 F.3d at 145. Thus, Ho plainly could be convicted if the jury found

16

that he acted on behalf of the domestic concern to assist that concern in obtaining business for CEFC Energy.

We conclude that the evidence introduced at trial was more than sufficient to prove that Ho acted on behalf of the U.S. NGO to assist it in obtaining business for CEFC Energy. Contrary to Ho's assertion that "at most a reasonable juror could find that . . . [he] worked for" the Hong Kong-based CEFC NGO, Ho Br. at 21, the government presented ample evidence demonstrating that the U.S. NGO operated as an arm of CEFC NGO and that Ho's actions in furtherance of the scheme were conducted in his capacity as officer or director of the U.S. arm to steer business to CEFC Energy.

For example, David Wen Riccardi-Zhu testified that he was a volunteer and employee of a CEFC entity classified as an NGO, which he described as based in Hong Kong but with "offices in the United States." App'x at 198. He later specifically identified the U.S. NGO as "the NGO that [he] worked for," *id.* at 202, and he acknowledged the existence of "an office in Virginia [that] we used a few times," *id.* at 204, in addition to a space in Trump World Tower in New York, *id.* at 206. In addition to testifying in general terms that Ho "ran the day-to-day operations of the NGO," *id.* at 198, Riccardi-Zhu further affirmed that, in his

17

understanding, Ho acted in his role as an officer and director of the U.S. entity, *id.* at 204. The jury could reasonably infer from this testimony that Ho acted on behalf of the U.S. arm when running NGO-related operations in New York.

And while Ho complains that the government "deliberately conflated" the NGOs at trial, Reply Br. at 1, the evidence, viewed most favorably to the government, indicates that it was the NGOs themselves that maintained overlapping identities in order to take advantage of each as best served particular interests. Thus, evidence showed that CEFC NGO held itself out as a single organization with a branch in the United States. The website, "cefc-ngo.co" – which Riccardi-Zhu described as "one of the websites that the NGO had," App'x at 215, without distinguishing between the Hong Kong and U.S. entities – described the NGO as one organization with operations in multiple countries. The jury also saw a screenshot of the website stating that "CEFC is headquartered in Hong Kong with more than 10 offices in the United States, Canada and other countries and regions." *Id.* at 731.

The government also introduced an email from Ho to Kutesa's UN office in which Ho held himself out as an officer of "a Chinese think tank registered in Hong Kong and also in the USA as a public charity." Gov. Addendum at 11; *see*

18

*also* App'x at 389. The only entity registered in the United States was the U.S. NGO. Thus, the jury could find that Ho used his position in an entity "organized under the laws of a State of the United States," 15 U.S.C. § 78dd-2(h)(1), as well as his position in foreign registered entities, to gain the access that best served his corrupt pursuit of benefits for CEFC Energy in the Uganda scheme. As to the Chad scheme, the jury heard testimony that Ho reached out to Jeremić on behalf of the NGO and asked for a connection to Gadio, whom Ho met at Trump World Tower – the very location that Riccardi-Zhu stated was occasionally used by the U.S. NGO.

Viewing this evidence in the light most favorable to the government, and drawing all inferences in support of the verdict, we find that the jury reasonably concluded that Ho acted on behalf of a domestic concern in directing business to CEFC. We therefore reject Ho's sufficiency challenge to Counts Two and Three.

## B. Ho Offers No Basis To Disturb His Money Laundering Convictions (Counts Six And Eight)

Ho next argues that his money laundering convictions must be reversed because (1) a violation of § 78dd-3 cannot constitute specified unlawful activity

19

under the money laundering statute, and (2) the government failed to prove that the transfer of funds went "to" or "from" the United States.  We disagree.

1.  A Violation Of 15 U.S.C. § 78dd-3 Is Sufficient To Establish Specified Unlawful Activity Under The Money Laundering Statute

Ho asserts that the jury was improperly charged when it was told that a violation of § 78dd-3 could serve as the specified unlawful activity underlying his money laundering convictions pursuant to 18 U.S.C. § 1956(c)(7)(D).  He argues that "when Congress amended § 1956(c)(7) to add the Foreign Corrupt Practices Act as a specified unlawful activity . . ., Congress was referring only to §§ 78dd-1 and 78dd-2 – not § 78dd-3, which was added to the Foreign Corrupt Practices Act six years later, in 1998."  Ho Br. at 25 (citation omitted).  To support this interpretation, Ho invokes the reference canon, by which a statute's reference to a general subject indicates dynamic meaning "as it exists whenever a question under the statute arises," *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019), while a statute's reference to another statute by specific title or section "takes the statute as it exists at the time of adoption," *Hassett v. Welch*, 303 U.S. 303, 314 (1938), without any subsequent amendments unless by express intent.  Thus, in Ho's view, "Congress's specific reference to the [FCPA] in § 1956(c)(7) manifested an intention to incorporate the FCPA as it existed in 1992, when the reference was

20

added to the statute." Ho Br. at 26. Because § 78dd-3 was not a part of the FCPA until six years later, Ho argues that it is not covered by the money laundering statute.

We review this question of statutory interpretation *de novo*. *United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016). "We ordinarily assume, absent a clearly expressed legislative intention to the contrary, that the legislative purpose is expressed by the ordinary meaning of the words used." *Jam*, 139 S. Ct. at 769 (internal quotation marks omitted). "When the language of the statute is clear . . ., our inquiry is complete and the language controls." *United States v. Kinzler*, 55 F.3d 70, 72 (2d Cir. 1995). In that case, "we have no reason to apply canons of construction." *New York ex rel. N.Y. State Off. of Child. & Fam. Servs. v. U.S. Dep't of Health & Hum. Servs.' Admin. for Child. & Fams.*, 556 F.3d 90, 98 (2d Cir. 2009).

The money laundering statute criminalizes the transfer of funds "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). The term "specified unlawful activity" is defined in § 1956(c)(7) to include "*any* felony violation of the Foreign Corrupt Practices Act." 18 U.S.C. § 1956(c)(7)(D) (emphasis added).

21

Because that language is plain, we decline Ho's invitation to read an unexpressed limitation into the statute through an unnecessary resort to the reference canon. In *New York State Office of Children & Family Services*, we similarly declined to turn to the reference canon where a statute straightforwardly referred to a concept described in another provision, without limitation. 556 F.3d at 97. There, we examined whether 42 U.S.C. § 672(a)(1)'s reference to "reasonable efforts of the type described in section 671(a)(15) of this title" incorporated a fixed concept of such efforts as they existed at the time of § 672(a)(1)'s adoption in 1980, or whether the statute incorporated subsequent amendments made to the referenced provision, § 671(a)(15), in 1997. *See id.* at 97–99. Despite the statute's reference to a specific section, we nevertheless understood the text to "plainly signal[] Congress's intent to incorporate the full range of 'reasonable efforts' required by § 671(a)(15)." *Id.* at 92. Indeed, we expressly rejected as inapplicable the argument that the reference canon showed that Congress did not intend to incorporate later amendments to the referenced provision, and found the "plain language of the statute to reveal the contrary, *i.e.*, that Congress unambiguously intended to incorporate" the amendments. *Id.* at 97. That conclusion rendered unnecessary any need "to resort to canons of construction." *Id.*; *see also id.* at 99

22

(explaining that the reference canon "is not a categorical rule that compels courts to always read statutory cross-references as pointing to their original targets," but "[r]ather, like all canons of construction, it is a tool to be used only where the meaning of the section" is unclear (internal quotation marks omitted)).

Applying the same principles here, we find that § 1956(a) "plainly signals Congress's intent to incorporate the full range" of felony violations under the FCPA. *See id.* at 92. As in *New York State Office of Children & Family Services*, the statute at issue here contains no textual limitation. Indeed, the use of the word "any" – particularly when paired with the broad descriptor "felony violation of the Foreign Corrupt Practices Act," rather than specific prohibitions – reinforces the natural reading of the statute to refer to whatever conduct constitutes such a violation. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (explaining that, "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (quoting Webster's Third New International Dictionary 97 (1976)).

Moreover, that reading is consistent with the statutory context. As we previously recognized, the money laundering statute "takes dead aim at the attempt to launder dirty money," while leaving "[w]hy and how that money got

23

dirty" to be "defined in other statutes." *United States v. Stavroulakis*, 952 F.2d 686, 691 (2d Cir. 1992). Consequently, we conclude that the statute's general reference to "*any* felony violation" extends to the identified criminal statutes as they develop to provide new ways for money to become tainted. We find that this interpretation aligns with courts' efforts to "read [statutes] as an ordinary citizen might" and not to "force lay persons to become experts in the vestigial esoterica of every statute and federal rule." *El Encanto, Inc. v. Hatch Chile Co., Inc.*, 825 F.3d 1161, 1164 (10th Cir. 2016) (Gorsuch, *J.*).

In light of the money laundering statute's "unambiguous . . . incorporation by reference" of the FCPA "in its entirety," *see N.Y. State Off. of Child. & Fam. Servs.*, 556 F.3d at 98, we reject Ho's suggestion that Congress was obliged to specify that its reference to the FCPA expressly included subsequent amendments to the statute. We likewise reject his suggestion that because Congress *could have* amended the money laundering statute to specifically include later FCPA amendments, its failure to do so reflects an intent to exclude those subsequent amendments. Given that § 1956 incorporates the umbrella concept of "any felony violation" of the FCPA, we see no reason to assume that Congress intended to impose on itself a continuing obligation to amend the money laundering statute

every time it amended or expanded the FCPA. *See id.* at 97 (rejecting argument that Congress's failure to "pluralize the word 'type' in [the referencing statute] to correspond to the expanded definition of 'reasonable efforts' in [the incorporated provision]" meant it intended the cross-reference to apply only to the unexpanded, pre-amended definition, where the incorporated provision's amendment introduced no grammatical inconsistency).

Our approach is not inconsistent with the Supreme Court's recent analysis in *Jam v. International Finance Corp.*, 139 S. Ct. 769 (2019), in which the Supreme Court turned to the reference canon to "confirm[]" what it determined was the "more natural reading" of the statute at issue, recognizing that courts usually assume that the ordinary meaning of a statute reflects the legislative intent. *Id.* at 769. Nothing in *Jam* compels us to depart from the ordinary meaning of § 1956's clear text or to resort to canons of construction, and we decline to do so today. We therefore hold that a violation of § 78dd-3 constitutes specified unlawful activity under the money laundering statute, and thus reject Ho's argument that the jury should have been instructed otherwise.

25

## 2. A Wire That Passes Through The United States Can Be Covered By 18 U.S.C. § 1956(a)(2)(A)

Next, we turn to Ho's argument that his money laundering convictions on Counts Six and Eight must be vacated because the wire transfers on which they were based went from Hong Kong to Uganda through the United States, and thus, did not go "to" or "from" the United States. In other words, Ho asserts that the money laundering statute does not cover wire transfers where the United States is neither the point of origination nor the end destination for the money, but is instead just an intermediate stop along the way. As relevant to this challenge, the money laundering statute makes it illegal for a person to "transport[], transmit[], or transfer[] . . . funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States" under certain circumstances. 18 U.S.C. § 1956(a)(2).

On appeal, Ho does not dispute that he caused a wire transfer of $500,000 to be sent from CEFC NGO "to an account belonging to the Food Security and Sustainable Energy Foundation at Stanbic Bank in Kampala, Uganda." Ho Br. at 14. Nor does he dispute that the $500,000 went "[f]rom HSBC Hong Kong on behalf of CEFC Limited as the originator, through to HSBC Bank US as the US correspondent for credit to Deutsche Bank in New York[,] US as a correspondent

26

for the beneficiary bank Stambic [sic] Bank in Uganda, for final credit to the beneficiary Food Security and Sustainable Energy Foundation." App'x at 400; *see also id.* at 690–91; Tr. 847–49 (showing that Ho sent bank information to his assistant, who confirmed to another CEFC Energy employee that the dollar-denominated payment should be made by wire transfer).

Instead, Ho contends that the wire underlying his conviction on Count Eight "was a single, continuing, transaction from Hong Kong to Uganda," and that under § 1956(i)(3), "a transfer of funds from one place to another, by wire or any other means, shall constitute a single, continuing transaction." Ho Br. at 29 (brackets and internal quotation marks omitted). Therefore, according to Ho, the funds went "through" the United States, as distinct from "to" or "from" the United States, as required by the statute. Ho relatedly asserts that the government's theory that the transaction between Hong Kong and Uganda was divisible into multiple transfers – from Hong Kong to the United States, and from the United States to Uganda – for purposes of the "to" and "from" determination was contrary to law. Accordingly, in Ho's view, the government failed to prove a wire transfer as required by § 1956(a).

27

Whether Ho's challenge is construed as a question of statutory interpretation or an attack on the sufficiency of the evidence, we review *de novo*. *See United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002) (characterizing appellants' comparable argument as "a mixed question of law and fact" requiring *de novo* review of the statute's meaning and the sufficiency of the government's evidence); *see also United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012) (applying *de novo* review for preserved claims regarding "[t]he sufficiency of an indictment and the interpretation of a federal statute"). Under either formulation, Ho's argument turns on what permissibly constitutes a transfer "to" or "from" the United States.

We reject Ho's claim that the charged wire transfer, which took advantage of U.S.-based correspondent accounts to conduct a dollar-denominated transaction, is barred from coverage under § 1956(a)(2)(A). Though Ho correctly asserts that statutory terms are generally to be given their ordinary meaning, we are unpersuaded that the plain meaning of "to," "from," and "through" compel his conclusion. *See* Ho Br. at 30–31 (arguing that "from" indicates a "starting point"; "to" is associated with reaching; and "through" suggests movement in one side and out another). The ordinary understanding of these terms does not require them to be mutually exclusive.

28

Ho's own example is illustrative. He asserts that "[o]ne would not say that one was coming 'from New York' when one's train from Boston to Washington stops in New York along the way; rather, one would say that one was going 'from' Boston, 'to' Washington, and 'through' New York." *Id.* at 31. Of course, in some conversational contexts, that may be true. But ordinary parlance would not necessarily *preclude* such a passenger from *also* saying that he travelled from New York to Washington. That's especially true if the passenger in question had to change trains at Penn Station. In ordinary communication, the expressions are not by nature at odds.

Describing the government's interpretation as being "that *anytime* a transfer goes 'through' the United States, it also goes 'to' it and 'from' it," Ho argues that such a reading "would render the term 'through' superfluous." *Id.* at 32 (emphasis added). But the government does not go so far, and neither do we. We do not reach, for example, whether the transportation of cash from Hong Kong in an airplane over the United States to a final destination in Uganda would be properly said to have gone "through," "from," or "to" the United States – let alone whether more than one of those prepositions could apply. We simply acknowledge that some schemes that colloquially go "through" the United States – in the sense that

29

their origins and destinations are elsewhere – might also be said to involve transfers that go "to" or "from" the United States.  They did so here.

The wire sent by Ho involved (1) HSBC Hong Kong debiting CEFC NGO's account in Hong Kong; (2) HSBC Hong Kong sending a payment message to HSBC Bank US, asking it to debit $500,000 from HSBC Hong Kong's correspondent account in New York; (3) HSBC Bank US debiting HSBC Hong Kong's same correspondent account; (4) HSBC Bank US and Deutsche Bank, New York settling a $500,000 transfer through a payment system; (5) Deutsche Bank crediting Stanbic Bank's correspondent account in New York; and (6) Stanbic Bank crediting Food Security and Sustainable Energy Foundation's account in Uganda. *See* App'x at 848–57 (showing wire transfers at issue broken into component parts); *see also* Rena S. Miller, Cong. Rsch. Serv., IF0873, *Overview of Correspondent Banking and "De-Risking" Issues* (Apr. 20, 2018).

Recognizing that a subset of this series of transactions went from or to the United States does not conflict with § 1956(i).  It bears noting that § 1956(i) is a venue provision, not a definitional one.  It permits a prosecution to be brought in "any district in which the financial or monetary transaction is conducted."  18 U.S.C. § 1956(i)(1)(A).  The term "conducts," however, is defined in § 1956(c)(2) to

30

include "initiating" or "participating in initiating" a financial transaction. And while § 1956(i)(3) provides that "a transfer of funds from [one] place to another . . . shall constitute a single, continuing transaction," it further provides that "[a]ny person who conducts (as that term is defined in subsection (c)(2)) *any portion of the transaction* may be charged in any district in which the transaction takes place." *Id.* § 1956(i)(3) (emphasis added). Even assuming that the overarching transfer between Hong Kong and Uganda would here be the relevant "single, continuing transaction" contemplated in § 1956(i), nothing about this venue provision's language prevents us from finding that such a transaction may simultaneously be comprised of intermediate stages or "portion[s] of the transaction." *Id.*

Indeed, courts – including the Second Circuit – have long conceived of transfers from one place to another as being severable, and resting in the United States, when moving through correspondent banks. *See United States v. Daccarett*, 6 F.3d 37, 54 (2d Cir. 1993) ("With each EFT at least two separate transactions occurred: first, funds moved from the originating bank to the intermediary bank; then the intermediary bank was to transfer the funds to the destination bank, a correspondent bank in Colombia."); *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 693 (S.D.N.Y. 2017) (noting that "international wire transfers do not

31

merely 'ricochet' off of U.S. correspondent banks," but rather, use such banks "as indispensable conduits" and involve "two separate transactions that cross the U.S. border" (internal quotation marks omitted)); *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 94 (D.D.C. 2017) ("The Court therefore again concludes that EFTs are two transactions: one transaction into the United States and one transaction out of the United States.").

Consequently, we disagree with Ho's view "that the government's strategy to separate the wire into discrete transactions was contrary to binding Second Circuit authority." Reply Br. at 9. Indeed, Ho's reliance on *United States v. Harris*, 79 F.3d 223 (2d Cir. 1996), is misplaced. To be sure, the *Harris* court found, on the facts of that case, that two transactions (one from New York to Connecticut, the other from Connecticut to Switzerland) were two stages "of a single plan to transfer funds from a place in the United States to or through a place outside the United States." *Id.* at 231 (internal quotation marks omitted). But *Harris* involved a § 1956(a) scheme where the defendant, charged with concealing funds, argued that he intended only the New York-to-Connecticut leg of the transfer to effectuate the concealment. *See id.* According to the defendant, because the international transfer from Connecticut to Switzerland was not "designed to conceal the nature,

32

location, source, and ownership of the funds," *id.*, he could not be convicted of violating § 1956(a)(2), which prohibits international transfer of funds from unlawful activity while "knowing that such transportation is designed . . . to conceal," 18 U.S.C. § 1956(a)(2). Rejecting the defendant's attempt to bifurcate his intent to conceal, the *Harris* court found that he had "a single plan to transfer funds" and noted that the jury instructions "dispel[led] any concerns that the jury considered each transfer" separately with respect to his intent to conceal. *Harris*, 79 F.3d at 231 (affirming the conviction because the court and jury considered "Harris' movements of funds from New York to Switzerland as single transfers that served to conceal the location of the funds from the banks"). *Harris*'s holding that the defendant engaged in a single plan to conceal the movement of funds abroad in no way precludes the jury from examining whether intermediate transfers went "to" or "from" an intermediate location.

Ho's reliance on *United States v. Dinero Express, Inc.*, 313 F.3d 803 (2d Cir. 2002), and *United States v. Moloney*, 287 F.3d 236 (2d Cir. 2002), is also misplaced. Ho argues that these cases stand for the proposition that the movement of funds in intermediate steps as part of a larger scheme can constitute only one transfer, regardless of how the wires are divided as a practical matter. But again, these

33

cases do not preclude interpreting the statute to mean that funds transferred in multiple steps at multiple banks are "to" or "from" those intermediate resting points.

*Dinero Express* held merely that a four-step money laundering transaction could constitute a "transfer" even though there was "no *individual* step" that "involved the direct wiring of money from the United States to the Dominican Republic." 313 F.3d at 805–06 (emphasis added). And *Moloney* likewise held "that a single money laundering count can encompass multiple acts provided that each act is part of a unified scheme." 287 F.3d at 241. Both cases found that composite steps could permissibly comprise a scheme giving rise to liability under § 1956(a); but neither case addressed whether those intermediate steps themselves might be considered transfers "to" or "from" the United States.

Moreover, in finding that an indictment may charge in one count an overarching transaction made up of multiple transfers, *Moloney* emphasized that "[t]his conclusion is particularly sound because money laundering frequently involves extended sequences of acts designed to obscure the provenance of dirty money." *Id.* That observation sheds light on the often complex nature of money laundering, and absent an express indication from Congress to the contrary, we

decline to bar juries from finding that a defendant "transports, transmits, or transfers" money "from" or "to" the United States, 18 U.S.C § 1956(a)(2), when a defendant arranges a wire transfer that uses the U.S. banking system to go from a foreign source, to a correspondent bank in the United States, to another bank in the United States, and then to a final foreign beneficiary. We will not "suppose that Congress did not intend to criminalize the use of United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency." *All Assets Held at Bank Julius*, 571 F. Supp. 2d at 12. Seeing no reason to hold that as a matter of law the jury was precluded from adopting the understanding of EFT and correspondent bank transfers articulated in *Daccarett*, *Bank Julius*, and *Prevezon*, we affirm.

## C. Ho's Evidentiary Challenges Are Meritless

Ho argues that the district court abused its discretion by admitting certain out-of-court statements and summary charts into evidence at trial. First, he argues that the district court erred in permitting Gadio to testify about statements made by Déby at the Chad meetings on December 8 and December 9. Second, Ho objects to the admission of Boubker Gadio's text message to his father concerning the Chad contract. Third, he challenges the admission of two summary charts that

35

provided timelines of certain text messages, emails, and other documents admitted into evidence.

We review a district court's evidentiary rulings for abuse of discretion. *See United States v. Taubman*, 297 F.3d 161, 164 (2d Cir. 2002). "To find such an abuse we must be persuaded that the trial judge ruled in an arbitrary and irrational fashion." *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996); *see also United States v. Monsalvatge*, 850 F.3d 483, 493 (2d Cir. 2017). Even if a district court abused its discretion in making an evidentiary ruling, we will not grant a new trial where the errors are harmless. *See* Fed. R. Crim. P. 52(a); *United States v. Rea*, 958 F.2d 1206, 1219–20 (2d Cir. 1992). For an error to be deemed harmless, "we are not required to conclude that [the evidence] could not have had any effect whatever; the error is harmless if we can conclude that [the evidence] was unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Rea*, 958 F.2d at 1220 (internal quotation marks omitted).

1. The District Court Did Not Abuse Its Discretion In Admitting Déby's Out-of-Court Statements About Cash Payments

Ho challenges the admission of statements made by Déby to Gadio on December 8, in which Déby expressed concern about finding cash in gift boxes, as well as Déby's similar statements to Ho and members of the CEFC delegation on

December 9, to which Ho responded. Ho maintains that the statements constitute inadmissible hearsay to which no exception applies.

The district court did not abuse its discretion in admitting the statements. As to the December 9 statement, in which Déby conveyed to the delegation his anger about receiving cash payments, the district court admitted the testimony as an adoptive admission by Ho under Federal Rule of Evidence 801(d)(2)(B). Specifically, it found that Ho's admissible response that he was "impressed by" Déby's reaction could "only make sense in the context of adopting the president's statement that the boxes had cash in them." Special App'x at 19.

Ho argues that his statement was merely "an effort to smooth things over diplomatically, or as a statement that Ho was and would have been impressed by Déby's rejection of any gift." Ho Br. at 40. But "[w]here the defendant's adoption . . . purportedly is manifested by . . . ambiguous conduct," we consider the statement's incriminatory content and whether it is of the type that a person would respond to with a denial "or at least with some indication that he objects to the statement as untrue." *United States v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980). Here, the district court reasonably concluded that if Ho did not agree with Déby's representation or had not been aware of the alleged cash bribes, he would have

37

said so.  In this context, the court acted well within its discretion in finding that Ho's lack of denial, coupled with his acknowledgement of Déby's reaction, supported an inference that Ho understood all along what was in the boxes.  *See United States v. King*, 560 F.2d 122, 134–35 (2d Cir. 1977).  Ho's response – however it was meant – would have made little sense to the jury without the admission of Déby's statement and reaction.  *See United States v. Guzman*, 754 F.2d 482, 487 (2d Cir. 1985).  Accordingly, the district court did not abuse its discretion in admitting Gadio's recounting of Déby's statements to Ho.

And because the district court appropriately admitted the December 9 statement, it also acted within its discretion in admitting the earlier December 8 statement "as context and to tell the story."  Special App'x at 21.  "When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed."  *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984).  Déby's statements provided context about the understanding and intent of those involved, and was relevant to contextualize the nature of the relationship among Déby, Gadio, and Ho, as well

as Déby's decision to meet with the CEFC delegation the next day. *See United States v. Lubrano*, 529 F.2d 633, 636–37 (2d Cir. 1975) (instructions by principal to agent immediately preceding principal's meeting with defendant was "relevant to aid the jury in understanding the background events leading up to the crimes in question").

In any event, because the substance of Déby's December 8 statement to Gadio reiterated Déby's admissible statement to Ho the following day, any error would necessarily have been harmless. *See United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003) (finding harmless error where jury would have reached same verdict in absence of case agent's hearsay testimony).

2. The District Court Properly Admitted Boubker Gadio's Text Message

Ho next challenges the admission of the text message from Boubker to his father referring to "our friends in China" and "their attempt to buy the president" of Chad. Ho Br. at 40. Contending that this message was "plainly hearsay," Ho argues that the district court erroneously admitted the statement under the rule of completeness and as a prior consistent statement. *Id.* As to the former, Ho contends that the "rule of completeness" does not apply because "only the party adverse to the party who introduced a document" may invoke it. *Id.* at 41. Ho

also argues that "the court's prior consistent statement rationale also fails" because "the text contained Boubker's words, not Gadio's," and was thus not Gadio's prior consistent statement. *Id.*

We have previously held that statements made by third parties – here, Boubker – can constitute prior consistent statements of a testifying witness – here, Gadio – if the witness adopted the third-party statement. In *United States v. Rubin*, we held that notes recounting an interview with the defendant were admissible as a prior consistent statement of a testifying witness named Cox, where a different person took the notes but Cox adopted them "as accurate and in accord with his own recollection." 609 F.2d 51, 62 (2d Cir. 1979), *aff'd*, 449 U.S. 424 (1981). As in *Rubin*, the witness here could be said to have adopted, at the time, the view expressed in the text. Gadio, like the witness in *Rubin*, testified to the adoption; that is, his silence in response to Boubker's text reflected his contemporaneous agreement with a statement he would otherwise have been expected to dispute or refute.

Moreover, once Gadio's adoption of his son's statement is recognized, it was admissible as a prior consistent statement if the prior statement was: (1) "consistent with the witness' in-court testimony," (2) "'offered to rebut an express

or implied charge against him of recent fabrication or improper influence or motive,'" and (3) "made prior to the time when the motive to fabricate arose." *Id.* at 61 (quoting Fed. R. Evid. 801(d)(1)(B)). Here, the adopted text message was consistent with Gadio's testimony that he, at the time of the alleged bribe, believed it to be a bribe. It was also offered to rebut Ho's assertion to the jury that, to avoid liability himself, Gadio had recently fabricated a narrative implicating Ho in the bribery scheme. Since the statement was made long before Gadio had any reason to falsely implicate others of criminal wrongdoing, it was relevant to rebut Ho's arguments that Gadio had falsely implicated him after Gadio's arrest. Accordingly, we find no abuse of discretion in the district court's admission of Boubker's text message as a prior consistent statement of Gadio, and therefore need not reach Ho's rule-of-completeness argument to affirm.

3. The District Court Did Not Err In Admitting The Summary Charts

Ho also challenges the admission of two summary charts that provided timelines of certain text messages, emails, and other documents admitted into evidence. He concedes that the charts accurately quote the underlying emails and text messages and could be used as demonstratives, but objects to their admission as trial exhibits available to the jury in its deliberations. Ho argues that Federal

41

Rule of Evidence 1006 does not permit summary charts to be "created for the purpose of generating a narrative supporting the prosecution's theory of the case," as he contends the charts were. Ho Br. at 43. He further contends that the charts summarized materials that could have "easily . . . been examined by the jury," as there were "only 71 documents related to the Chad Scheme plus translations (totaling 370 pages), and 62 documents related to the Uganda Scheme plus translations (totaling 399 pages)." *Id.* at 44.

Under Rule 1006, a proponent of evidence "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. "This court has long approved the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, so long as the judge properly instructs the jury," as the judge did here, "that it is not to consider the charts as evidence." *United States v. Casamento*, 887 F.2d 1141, 1151 (2d Cir. 1989) (internal citations omitted) (rejecting appellants' argument that "despite the judge's instructions, the vast amount of evidence presented to the jury made it inevitable that the jury would rely uncritically on the government's summary charts," and noting that "[b]arring contrary evidence, we must presume that juries

follow the instructions given them by the trial judge"); *see United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988) (finding no abuse of discretion where court allowed summary charts identifying phone participants, conspirators' numbers and addresses, and the locations from which calls were placed or received); *United States v. Goldberg*, 401 F.2d 644, 647-48 (2d Cir. 1968) (affirming trial court's admission of charts that were constructed "from the testimony of the government's witnesses and from . . . voluminous business records"); *see also United States v. Thiam*, 934 F.3d 89, 96–97 (2d Cir. 2019) (affirming a trial court's admission of a summary chart because the "evidence was useful to the jury in understanding Thiam's motivation for accepting bribes and his consciousness of guilt respectively").

Here, the jury was properly advised that the charts themselves did not constitute independent evidence and that it was the jury's duty to first determine that they accurately reflected the evidence on which they were based. And while it is true that summary charts are sometimes used to synthesize even larger volumes of documentary evidence than was the case here, *see, e.g.*, *Casamento*, 887 F.2d at 1151, it was clearly not an abuse of discretion for the district court to conclude that hundreds of pages of evidence merited the use of summary charts

43

in a complex fraud trial. We therefore affirm the district court's evidentiary rulings.

### D. The Indictment Properly Charged Ho Under Different Sections Of The FCPA (Counts One, Four, And Five)

Ho argues that the indictment was "'repugnant' because it contain[ed] [a] 'contradiction between material allegations'" when it alleged that Ho was "a domestic concern" in one count while bringing charges that did not apply to domestic concerns in another. Ho Br. at 51–52 (quoting *United States v. Cisneros*, 26 F. Supp. 2d 24, 52 (D.C. Cir. 1998)); *see also Malvin v. United States*, 252 F. 449, 456 (2d Cir. 1918) (suggesting that "averments of [an] indictment" may be "repugnant" where they are inconsistent). He also argues that the indictment was invalid because it charged Ho under two mutually exclusive sections of the FCPA, §§ 78dd-2 and 78dd-3. According to Ho, these purported errors "required that Counts [Four] and [Five] be stricken, which would also have fatally undermined Count [One]." Ho Br. at 49–50. We disagree.

### 1. The Indictment Was Not Repugnant

Ho argues that the indictment was facially inconsistent as to material allegations, thus rendering Counts Four and Five defective, because the grand jury determined that he was a "domestic concern," to which § 78dd-3 does not apply.

44

To show that the grand jury "determined" Ho was a domestic concern, he relies on the indictment's language in Counts Two and Three, which allege violations of § 78dd-2. Tracking the statute and using the conjunctive, the indictment alleged that "the defendant, . . . being a domestic concern *and* an officer, director, employee, and agent of a domestic concern," paid bribes in violation of § 78dd-2. App'x at 85–86, 90, 91 (emphasis added). Based on the indictment's use of "and" rather than "or," Ho argues that the grand jury must have found that he was a domestic concern, and that he could therefore not also be charged in Counts Four and Five, which allege violations of § 78dd-3 – a provision that does not cover domestic concerns.

We are not persuaded by Ho's argument that the grand jury found that Ho was *himself* a domestic concern. Our case law, which upholds the practice of pleading in the conjunctive without requiring that the government prove all possibilities at trial, undermines the view that the grand jury "finds" each fact alleged conjunctively in a charge on which the grand jury indicts. In *United States v. McDonough*, 56 F.3d 381 (2d Cir. 1995), we rejected the defendant's argument that because "the [grand jury] indictment charged him with two purposes in the conjunctive, the government was required to prove both at trial." *Id.* at 390.

"Where there are several ways to violate a criminal statute, . . . federal pleading requires that an indictment charge in the conjunctive to inform the accused fully of the charges." *Id.* (brackets, ellipsis, internal quotation marks, and citations omitted) (explaining that "[a] conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged"); *see also Griffin v. United States*, 502 U.S. 46, 51 (1991) (acknowledging the "historical" and "regular practice for prosecutors to charge conjunctively, in one count, the various means of committing a statutory offense, in order to avoid the pitfalls of duplicitous pleading"). The indictment followed that instruction here.

Nor is there any reason to believe that Ho was confused as to the government's theory of liability in Counts Four and Five. Ho clearly knew that the government was not alleging that he was a domestic concern, and the parties in fact stipulated that he "was not a citizen, national, or resident of the United States." Tr. 829–30; *see also* Special App'x at 9 (district court noting that the complaint on which Ho was arrested alleged that he "was an officer, director, employee, and agent of a domestic concern" while charging that the "NGO was a domestic concern"). Moreover, the district court expressly instructed the jury that "Counts Two and Three charge the defendant based on his status as an alleged

46

officer, director, employee, or agent of a domestic concern." Tr. 1081–82; *see also id.* at 1083–84 (reiterating that for Count Two, "the government must prove . . . that the defendant was an officer, director, employee, or agent of a domestic concern, or a stockholder thereof acting on behalf of such domestic concern").

But even if it could be argued that the conjunctive language inserted error in the grand jury process, such error clearly would have been harmless. The Supreme Court has held that "the petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted," and that "the convictions must [therefore] stand despite" error in the grand jury process. *United States v. Mechanik*, 475 U.S 66, 67 (1986) (upholding indictment where tandem witnesses testified before the grand jury); *see also United States v. Friedman*, 854 F.2d 535, 541, 583 (2d Cir. 1988) (upholding indictment even assuming government repeatedly leaked grand jury information, resulting in extensive publicity surrounding grand jury proceedings).

While *Mechanik* and *Friedman* involved errors in or surrounding the proceedings in which the grand jury reached its decision – rather than an allegedly duplicitous indictment – the reasoning behind those cases applies equally here.

47

"The reversal of a conviction entails substantial social costs," which "are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence. But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial." *Friedman*, 854 F.2d at 583 (quoting *Mechanik*, 475 U.S. at 72) (emphasis omitted).

Here, as noted, Ho was informed well before trial of the particular way in which he was alleged to have violated the FCPA, and he had ample opportunity to prepare his defense in response to that theory. We therefore cannot say that any purported inconsistency in the indictment caused him prejudice at trial, and Ho does not do much to suggest otherwise. He instead seeks to distinguish this case from *Friedman* and *Mechanik* by suggesting that "[a] procedural error in the grand jury's process (such as the presence of an unauthorized person in the grand jury, or a violation of grand jury secrecy rules)" is less central to the "heart of the grand jury's assignment" than a purportedly "fundamental contradiction in the indictment itself." Reply Br. at 23. But this proposition is easily dismissed, since an indictment's purported inconsistency caused by conjunctive pleading poses no greater "theoretical potential to affect the grand jury's determination whether to

48

indict," *Mechanik*, 475 U.S. at 70, than does an error during the proceeding. Indeed, unlike a violation of grand jury secrecy rules, such an inconsistency would seem to pose little risk to a defendant's right to a fair trial before the petit jury, *see Friedman*, 854 F.2d at 583, giving further assurance that "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt," *Mechanik*, 475 U.S. at 70. Accordingly, Ho's challenge fails.

### 2. Sections 78dd-2 And 78dd-3 Of The FCPA Are Not Mutually Exclusive

Section 78dd-2 of the FCPA renders it unlawful for "any domestic concern, . . . or for any officer, director, employee, or agent of such domestic concern . . . acting on behalf of such domestic concern" to engage in certain prohibited practices involving foreign trade. Section 78dd-3, by contrast, renders unlawful the same conduct by "any person other than . . . a domestic concern (as defined in section 78dd-2 of this title), or for any officer, director, employee, or agent of such person . . . acting on behalf of such person, while in the territory of the United States."

Arguing from the legislative history and purported intent of Congress, Ho contends that §§ 78dd-2 and 78dd-3 are mutually exclusive. Broadly, he argues that the statute addresses "three separate categories" of violators – "issuers, [under] § 78dd-1; domestic concerns and their agents, [under] § 78dd-2; and anyone else and their agents, [under] § 78dd-3." Reply Br. at 24. As support, Ho points to a Senate Committee Report, which explains that § 78dd-3 provides "criminal and civil penalties *over persons not covered under the existing FCPA provisions regarding issuers and domestic concerns*." *See* Ho Br. at 52–53 (quoting S. Rep. No. 105-277, at *5 (1998)). He also argues that *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018), supports his position that §§ 78dd-2 and 78dd-3 are mutually exclusive because the Court "[r]eferr[ed] to § 78dd-3" to indicate it applied to foreign persons "*not within any of the aforementioned categories* who violate the FCPA while present in the United States." Ho Br. at 53–54 (internal quotation marks omitted). Finally, Ho argues that ambiguous criminal statutes must be interpreted narrowly according to the rule of lenity.

But the FCPA's statutory language contains no indication that the provisions are mutually exclusive, or that both sections would not cover a director, like Ho, who acts on behalf of both a domestic concern – here, the U.S. NGO – and

50

on behalf of a person other than a domestic concern – here, CEFC NGO. As we noted in *Hoskins*, Congress sought to subject foreign persons to FCPA liability if they "fit within three categories: (1) those who acted on American soil, (2) those who were officers, directors, employees, or shareholders of U.S. companies, and (3) those who were agents of U.S. companies." 902 F.3d at 91. Nothing in the language of the statute, or *Hoskins*, prevents an individual from fitting within more than one of those three categories, particularly where, as here, that individual acts on U.S. soil on behalf of both domestic and foreign entities. The FCPA's clear text therefore makes it unnecessary for us to examine its legislative history or invoke the rule of lenity, and we accordingly reject Ho's claim that his §§ 78dd-2 and 78dd-3 convictions are mutually exclusive.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.